UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
ROY DEN HOLLANDER,

                    Plaintiff,

                                        10 Civ. 9277 (LTS)(HBP)

        - against -                     **ORIGINAL**
                                        **FILED BY ECF**

MEMBERS OF THE BOARD OF REGENTS
OF THE UNIVERSITY OF THE STATE
OF NEW YORK, in their official
and individual capacities,
*et al.*,

                    Defendants.
------------------------------X


                **MEMORANDUM OF LAW IN SUPPORT OF THE**
                **STATE DEFENDANTS' MOTION TO DISMISS**
                **THE COMPLAINT**


                        ERIC T. SCHNEIDERMAN
                        Attorney General of the
                         State of New York
                        Attorney for the State Defendants
                        120 Broadway - 24th Floor
                        New York, New York  10271
                        (212) 416-8634

CLEMENT J. COLUCCI
Assistant Attorney General
        Of Counsel

## TABLE OF CONTENTS

**Pages**

Preliminary Statement ....................................................................................................................1

FACTS...............................................................................................................................................2

    A.    *Hollander I* ...............................................................................................................3

    B.    The Present Action ..................................................................................................3

    C.    The State Defendants: Powers and Responsibilities .............................................4

            1. The Regents and the Commissioner..................................................................4
            2. HESC.................................................................................................................7

STANDARD OF REVIEW..............................................................................................................7

        Rule 12(b)(1) ................................................................................................................7
        Rule 12(b)(6) ................................................................................................................8

ARGUMENT ....................................................................................................................................9

    POINT I
        THE ACTION SHOULD BE DISMISSED ON THE GROUNDS
        OF *RES JUDICATA* ...............................................................................................9

    POINT II
        THE ESTABLISHMENT CLAUSE CLAIMS MUST BE DISMISSED
        BECAUSE "FEMINISM" IS NOT A RELIGION AND THE STATE
        DEFENDANTS' ACTIVITIES DO NOT TEND TO ESTABLISH
        RELIGION ......................................................................................................10

        A. "Feminism" is Not a Religion for Purposes of the Establishment Clause......11

        B. Registration of Curricula and Degree Programs That Comply With
           Religion-Neutral Academic Standards Does Not Constitute an
           Establishment of Religion ...........................................................................16

          1.  Secular Purpose ...........................................................................................17
          2.  Primary Effect ..............................................................................................17
          3.  Entanglement...............................................................................................18

        C. Bundy Aid May be Given Even to Religious Institutions and Programs
           Without Violating the Establishment Clause .................................................19

## TABLE OF CONTENTS

**Pages**

    1.  Religiously-Neutral Definition of Beneficiaries............................................20

    2.  No Indoctrination by the Government...........................................................20

  D. Because HESC Provides Grants and Loan Guarantees to Students Rather
     Than Institutions, its Activities Do Not Violate the Establishment Clause....22

CONCLUSION ...............................................................................................................................23

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ROY DEN HOLLANDER,                              :
                                                :
                        Plaintiff,              :
                                                :
            -against-                           :        10 Civ. 9277 (LTS) (HBP)
                                                :
MEMBERS OF THE BOARD OF                         :        (ORIGINAL FILED BY E.C.F.)
REGENTS OF THE UNIVERSITY OF                    :
THE STATE OF NEW YORK, in their                 :
official and individual capacities, *et al.*,   :
                                                :
                        Defendants.             :
-----------------------------------------------------X

### MEMORANDUM OF LAW IN SUPPORT OF
### THE STATE DEFENDANTS' MOTION
### TO DISMISS THE COMPLAINT

Defendants the members of the Board of Regents of the University of the State of New

York; Merryl Tisch, Chancellor of the Board of Regents; Commissioner David M. Steiner of the

New York State Education Department ("SED"); and Elsa Magee, Acting President of the New

York State Higher Education Services Corporation ("HESC") (collectively, the "State

Defendants),"[1] by their attorney, ERIC T. SCHNEIDERMAN, Attorney General of the State of

New York, respectfully submit this memorandum of law in support of their motion to dismiss the

complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

### PRELIMINARY STATEMENT

The current complaint is a slightly trimmed-down version of that in *Hollander v. Institute*

*for Research on Women and Gender at Columbia University, et al.,* 08 Civ. 7286 (LAK)

---

[1]    Although the complaint names each of the State Defendants in both their official and
individual capacities, plaintiff seeks only declaratory and injunctive relief, which is properly
awarded only against official-capacity defendants. *See* Complaint ("Compl."), ¶¶ 164-67.

("*Hollander I*"), in which the same lead plaintiff[2] sued the same State and Federal defendants (or their predecessors in office), for the same acts, on the same legal theory.[3] The District Court, Lewis A. Kaplan, J., dismissed the complaint in *Hollander I* for lack of standing and on the merits. *Hollander I*, 2009 WL 1025960 (S.D.N.Y. Apr. 15, 2009). The United States Court of Appeals for the Second Circuit summarily affirmed on standing grounds, without reaching the merits. *Hollander I*, 372 Fed. App'x 140 (2d Cir. 2010). Plaintiff never sought review in the United States Supreme Court.

Plaintiff now seeks to re-litigate the very claim previously brought, and previously dismissed, against the same State and Federal defendants in *Hollander I*. The complaint should be dismissed because, under principles of *res judicata* or claim preclusion, the judgment in *Hollander I* bars this action. Furthermore, on the merits, the complaint fails to state a claim for relief.

## FACTS

Plaintiff Roy Den Hollander is a New York State resident and an alumnus of Columbia University. (Complaint ["Compl."], ¶ 13) He asserts an interest in attending continuing education courses at his alma mater, but alleges that he is deterred from doing so because he expects to be exposed to "unwelcome and offensive Feminist dogma from Columbia administration, professors, counselors, materials, and school activities." (*Id.*, ¶¶ 84-85) Furthermore, he contends that Columbia University's Institute for Research on Women and Gender Studies, promotes what plaintiff conceives of as the Religion of Feminism with the active regulatory and financial assistance of the defendants, in violation of the Establishment

---

[2]     As in this case, plaintiff sought to prosecute his earlier claims in the form of a class action. The disposition of the earlier case mooted the question of class status.

[3]     That *Hollander I* complaint named additional defendants and asserted additional claims not named or asserted in the present action.

2

Clause.  (*Id.*, ¶¶ 18-69, 92-163)

**A.**    *Hollander I*

On August 18, 2008, plaintiff brought essentially the same lawsuit, against essentially the same defendants.  (*Hollander I* Docket, Document 1)  On December 1, 2008, plaintiff filed an amended complaint naming an additional individual plaintiff and purporting to proceed as a class action.  (*Hollander I* Docket, Document 17)  On April 15, 2009, Magistrate Judge Kevin Nathaniel Fox issued a Report and Recommendation recommending dismissal on the grounds of standing.  (*Hollander I* Docket, Document 33)  On April 24, 2009, District Judge Lewis Kaplan adopted the Report and Recommendation and, in addition, found that the complaints failed to state a cause of action on the merits.  (*Hollander I* Docket, Document 36)  On April 16, 2010, the United States Court of Appeals for the Second Circuit affirmed the District Court's decision, resting entirely on standing grounds, by summary order.  *Hollander v. Institute for Research on Women & Gender at Columbia University, et al.,* 09-1910-cv, 372 Fed. App'x 140 (2d Cir. 2010).  Plaintiff did not seek further review in the Supreme Court.

**B.**    **The Present Action**

On December 13, 2010, plaintiff filed the present action.  The only real differences between *Hollander I* and the present action is that plaintiff has now dropped the Columbia-affiliated defendants he previously sued, and the Equal Protection and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, claims he also raised, in *Hollander I.* (*Hollander I* Docket, Document 1)  As before, plaintiff claims that Columbia promulgates a religion of Feminism, and that the New York State and Federal governments, through regulation and financial aid to colleges and students, promote the Religion of Feminism and thereby violate the Establishment Clause.

3

**C.     The State Defendants: Powers and Responsibilities**

The different State Defendants have different roles in higher education. First, the Board of Regents, its Chancellor, and the Commissioner of Education have various regulatory powers and oversee some forms of financial assistance to students and to institutions of higher education. Second, HESC provides certain financial aid to students and guarantees student loans.

**1.     The Regents and the Commissioner:** Since 1784, the Regents of the University of the State of New York have been empowered "to encourage and promote education, to visit and inspect its several institutions, to distribute to or expand or administer for them such property or funds as the state may appropriate therefor or as the university may own or hold in trust or otherwise." N.Y. Educ. Law § 201; *see also* N.Y. Educ. Law § 202 (describing organization of the Board of Regents); N.Y. Const., Art. 11, § 2 (continuing Board of Regents). The Regents appoint a Commissioner of Education to head the New York State Education Department, which "is charged with the general management and supervision of all public schools and all of the educational work of the state, including the operations of The University of the State of New York." N.Y. Educ. Law § 101.

All institutions of higher education in New York State, whether public or private, are part of the University of the State of New York, and must comply with its rules or any applicable laws. *See* N.Y. Educ. Law § 214. The Regents, the Commissioner, or any of their representatives "may visit, examine into and inspect, any institution in the university," and require reports. N.Y. Educ. Law § 215. The Regents may suspend the charter, or other rights and privileges, of any institution in the University of the State of New York "[f]or refusal or continued neglect . . . to make any report required, or for violation of any law or any rule of the

4

university." *Id.* The Regents have broad power to "exercise legislative functions concerning the educational system of the state, determine its educational policies, and . . . establish rules for carrying into effect the laws and policies of the state, relating to education."[4]  N.Y. Educ. Law § 207.

Particularly relevant to the issues in this cases is the power of the Regents to "register domestic and foreign institutions in terms of New York standards, and fix the value of degrees, diplomas and certificates issued by institutions of other states or countries and presented for entrance to schools, colleges and the professions in this state." N.Y. Educ. Law § 210.  Pursuant to this authority, the Regents have set requirements for earned undergraduate and graduate degrees. *See* 8 N.Y.C.R.R. § 3.47.

The basic requirement is that "[n]o earned undergraduate or graduate degree shall be conferred unless the applicant has completed a program registered by the department [of Education]." 8 N.Y.C.R.R. § 3.47(a)(1).  The Regents have established standards governing the eligibility of students to pursue undergraduate or graduate degrees, *see* 8 N.Y.C.R.R. § 3.47(a)(2), and general standards applicable to all registered undergraduate and graduate degrees. *See* 8 N.Y.C.R.R. § 3.47(c), (d).  Currently, the Regents have registered 150 different degree programs that may be offered by qualifying institutions in New York State, including 20 in explicitly religious subjects, ranging from the S.M.B. degree for a Bachelor of Sacred Music

---

[4]     One limit on the Regents's authority is relevant to the issues raised in this case: "But no enactment of the regents shall modify in any degree the freedom of the governing body of any seminary for the training of priests or clergymen to determine and regulate the entire course of religious, doctrinal, or theological instruction to be given in such institution." N.Y. Educ. Law § 207.  As a result, although the Regents have broad general regulatory authority over explicitly religious educational institutions, such as seminaries, they have no authority to judge the correctness of any religious teaching. *See Warder v. Bd. of Regents*, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), *cert. denied*, 454 U.S. 1125 (1981) (denial of charter to seminary upheld when based on finding of secular, academic deficiencies).

5

to the S.T.D. degree for a Doctor of Sacred Theology. *See* 8 N.Y.C.R.R. § 3.50 (listing registered degrees).

"[E]very curriculum creditable toward a degree offered by institutions of higher education" in New York State must be registered with SED.[5] *See* 8 N.Y.C.R.R. § 52.1(a)(1). Under authority granted by the Regents, the Commissioner has set standards for the registration of undergraduate and graduate curricula. *See* 8 N.Y.C.R.R. § 52.2. The Commissioner's standards address such objective criteria as financial resources and physical plant and equipment, *see* 8 N.Y.C.R.R. § 52.2(a), sufficient, trained faculty, *see id.* § 52.2(b), minimum amounts of full-time equivalent study with adequately available course selections, *see id.* § 52.2(c), and various other requirements concerning admission to programs of study and administration, *see id.* § 52.2(d)-(f). "Registration or reregistration of a curriculum may be denied if the commissioner finds that curriculum, or any part thereof, not to be in compliance with statute or this Title." 8 N.Y.C.R.R. § 52.2(l).

The Commissioner and the Regents can refuse to register proposed degree programs if they fail to meet these secular, religion-neutral academic standards. *See Moore v. Bd. of Regents*, 44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) (upholding denial of registration for Ph.D. programs in English and History at the State University of New York at Albany based upon lack of sufficient faculty resources); *Warder v. Bd. of Regents*, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), *cert. denied*, 454 U.S. 1125 (1981) (upholding denial of charter to seminary based upon finding of secular, academic deficiencies).

Beyond their regulatory role in higher education, the Regents and SED also have a

---

[5]     All courses offered must be "part of a registered curriculum," but individual courses are not themselves registered. *See* 8 N.Y.C.R.R. § 52.1(f); *see also id.* § 52.2 (describing registration standards). The institution must, however, describe courses offered in writing and state their subject matter and requirements. *See* 8 N.Y.C.R.R. § 52.2(c)(1).

financial role.  Non-profit colleges and universities incorporated by the Regents maintaining one

or more registered degree programs and meeting various educational standards receive cash

awards, known as "Bundy Aid," *see Excelsior Coll. v. N.Y. State Educ. Dep't*, 306 A.D.2d 675,

761 N.Y.S.2d 700 (3d Dep't 2003), based on the number and type of earned degrees awarded.

*See* N.Y. Educ. Law § 6401.

     **2.**     **HESC:**  HESC is an educational corporation and an agency of the State of New

York created to administer New York State's financial aid programs and the Federal Family

Education Loan Program ("FFELP") in New York State. *See* N.Y. Educ. Law, § 652(2)(a)-(c),

20 U.S.C. § 1071, *et seq*.  HESC guarantees higher education loans made by private lenders

under FFELP to New York State residents or to persons attending colleges or vocational schools

in New York State. *See* N.Y. Educ. Law § 680(1)(b); 20 U.S.C. § 1085(j).  HESC also

administers programs providing direct grants of financial aid to students. *See* N.Y. Educ. Law

§§ 666-669 (general awards), 670-680 (performance-based awards).  All of these grants and

loans are made to *students*, who may use the proceeds to attend any eligible institution of higher

education and take any course of instruction approved for that institution. *See* N.Y. Educ. Law

§ 661.

**STANDARD OF REVIEW**

**Rule 12(b)(1)**

     Under Fed. R. Civ. P. 12(b)(1), a complaint is properly dismissed for lack of subject

matter jurisdiction if the court "lacks statutory or constitutional power to adjudicate it."

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "In considering a motion to

dismiss for lack of subject matter jurisdiction, [courts] accept as true all material factual

allegations in the complaint.  However, argumentative inferences favorable to the party asserting

7

jurisdiction should not be drawn." *Atlantic Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (internal citations omitted). In evaluating jurisdictional issues, the court may also properly consider matters outside the pleadings, including state and federal law. *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, -- U.S. --, 130 S. Ct. 2869 (2010).

**Rule 12(b)(6)**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, -- U.S.--, 129 S. Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged." *Id.* This rule does not compel a litigant to supply "detailed factual allegations" in support of his claims, *Twombly*, 550 U.S. at 555, "but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," *Iqbal*, 129 S. Ct. at 1949. "A pleading that offers 'labels and conclusions' ... will not do." *Id.* (*quoting Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (*quoting Twombly*, 550 U.S. at 557). A complaint states a plausible claim when the non-conclusory facts that a plaintiff alleges allow the court "to draw the *reasonable* inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added).

As demonstrated below, plaintiff's claim fails to meet the relevant standards.

## ARGUMENT

## POINT I

## THE ACTION SHOULD BE DISMISSED ON
## THE GROUNDS OF *RES JUDICATA*

In *Friarton Estates Corp. v. City of New York*, 681 F.2d 150, 158 (2d Cir. 1982), Judge Friendly justified a long discussion of plaintiff's prior litigation because "mere statement is all that is required to support the [defendant's] argument of *res judicata*." So too here. No extended argument is necessary to prove that, under principles of *res judicata* or claim preclusion, the judgment in *Hollander I* bars this action.

"Public policy dictates that there be an end to litigation; that those who have contested an issue shall be bound by the result, and that matters once tried shall be considered forever settled between the parties." *Baldwin v. Travelling Men's Ass'n,* 283 U.S. 522. 525 (1931). "Under the doctrine of *res judicata*, or claim preclusion, '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *St. Pierre v. Dyer,* 208 F.3d 394, 399 (2d Cir. 2000) (*quoting Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)).

*Res judicata* or claim preclusion bars re-litigation of issues that were or could have been raised in an earlier action if the earlier action was concluded with a final judgment on the merits, by a court of competent jurisdiction, in a case involving the same parties or their privies, and the same cause of action. *See Allen v. McCurry,* 449 U.S. 90, 94 (1980); *EDP Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007). This action involves the same plaintiff and the same defendants as were involved in *Hollander I*, except for some that were dropped; raises the same claims as in *Hollander I*, except for some that were dropped; and is brought in the same Court as *Hollander I*. The only element that might give any pause at all is whether a final

9

judgment dismissing *Hollander I* on grounds of standing is a final judgment "on the merits."

Although a dismissal on grounds of standing is not "on the merits" on the substance of the claims asserted, it is "on the merits" on the question of standing itself. *See Mrazek v. Suffolk Cnty. Bd. of Elections*, 630 F.2d 890, 898, n. 10 (2d Cir. 1980) ("the issue of Mrazek's and Migliore's standing, by all accounts, has been determined adversely to them in the state courts and that decision is binding upon us under principles of res judicata."); *Coll. Sports Council v. Dep't of Educ.*, 465 F.3d 20, 22-23 (D.C. Cir. 2006) (affirming on *res judicata* grounds determination that plaintiffs lacked standing); *Perry v. Sheahan*, 222 F.3d 309, 318 (7th Cir. 2000) ("The determination that Perry lacked standing in *Perry I* precludes relitigation of the same standing argument in *Perry II*."). The determination in *Hollander I* that plaintiff lacks standing to maintain this action is, therefore, *res judicata* in *Hollander II*.

Nor does it matter that plaintiff may be trying to assert different or better grounds for standing in *Hollander II* than he did in *Hollander I. See* Compl., ¶¶ 70-91. None of the facts upon which plaintiff now seeks to rely to establish standing is new; they could have been presented to the Court in *Hollander I.* "Only facts arising after the complaint was dismissed -- or at least after the final opportunity to present facts to the court -- can operate to defeat the bar on issue preclusion." *Perry,* 222 F.3d at 318. Plaintiff was judged to lack standing in *Hollander I*. That judgment precludes him from asserting standing to maintain this duplicative action. Therefore, the complaint should be dismissed.

## POINT II

### THE ESTABLISHMENT CLAUSE CLAIMS MUST BE DISMISSED BECAUSE "FEMINISM" IS NOT A RELIGION AND THE STATE DEFENDANTS' ACTIVITIES DO NOT TEND TO ESTABLISH RELIGION

Plaintiff's claim that the State Defendants have violated his rights under the

10

Establishment Clause "by requir[ing] higher education institutions . . . to adhere to the doctrine

of Feminism" and "expend public funds, which are appropriated by the New York State

Legislature and mandated for higher education, in support of the inculcation of Feminism,"

(Compl., ¶¶ 3-4), which plaintiff conceives of as a religion, (*id.*, ¶¶ 44-69) fails because

"Feminism" is not a religion, but a secular academic point of view, and, as such, not the proper

subject of an Establishment Clause challenge. Furthermore, even assuming that "Feminism" is a

religion, the State Defendants' enforcement of secular, religion-neutral educational standards and

provision of generally-available financial aid to institutions and students do not violate the

Establishment Clause.

## A.     "Feminism" is Not a Religion for Purposes of the Establishment Clause

Plaintiff appears to believe that some adherents of the secular viewpoint commonly

known as "feminism" hold to it with the fervor often associated with religion. (Compl., ¶¶ 48-

50) But the Constitution does not prohibit the establishment of, or protect the free exercise of,

philosophies or viewpoints that share characteristics with religion; it prohibits the establishment,

and protects the free exercise, of *religion* and only religion. "A way of life, however virtuous or

admirable, may not be interposed as a barrier to reasonable state regulation . . . if it is based on

purely secular considerations; to have the protection of the Religion Clauses, the claims must be

rooted in religious belief." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972); *see also Thomas v.

Review Bd.*, 450 U.S. 707, 713 (1981) ("Only beliefs rooted in religion are protected by the Free

Exercise clause, which, by its terms, gives special protection to the exercise of religion.").

The Supreme Court, having clarified decades ago that the First Amendment's Religion

Clauses apply only to religion, and abandoned earlier suggestions that they apply as well to

secular beliefs functionally equivalent to religion, *see U.S. v. Seeger,* 380 U.S. 163, 166 (1965)

11

and *Welsh v. U.S.*, 398 U.S. 333, 340 (1970) (both expanding the Selective Service Act's

exemption for conscientious objectors to include objectors with non-religious moral or ethical

beliefs and suggesting that a different reading might violate the Religion Clauses), has not since

attempted to define "religion." *See* Stanley Ingber, *Religion or Ideology: A Needed Clarification

of the Religion Clauses,* 41 Stan. L. Rev. 233, 264 (1989) ("While explicitly acknowledging the

need to distinguish religion from other belief systems, . . . the Court remains unwilling to

commence the task."). In the absence of cases requiring it to decide whether a given belief is

"religious," the Court can hardly be blamed for declining to take on "a difficult and delicate task."

*Thomas*, 450 U.S. at 714. But lower courts and commentators have struggled with the question,

mainly in Free Exercise cases, but not, as relevant here, in Establishment Clause cases.

The scholarly commentary on how or whether to define religion is voluminous.[6]  Lower

courts have evolved three-part tests, s*ee Africa v. Commonwealth of Penn.*, 662 F.2d 1025, 1032-

1036 (3d Cir. 1981), and ten-part tests, *see U.S. v. Meyers*, 93 F.3d 1475, 1482-85 (10th Cir.

1996). The Second Circuit, for its part, has attempted a broad, but not boundless, definition in

Free Exercise cases:

> The term "religion" was defined by the Supreme Court nearly 100
> years ago . . . as having reference to a person's views of his
> relationship to his Creator. This definition seems unduly narrow
> today. In every religion there is an awareness of what is called
> divine and a response to that divinity. . . . But, there are religions
> which do not positively require the assumption of a God, for
> example, Buddhism and the Unitarian Church. Hence a broader
> definition of the word religion – one which we think more
> accurately captures its essence – is that formulated by the
> pre-eminent American philosopher, William James, who said
> religion means: "the feelings, acts, and experiences of individual

---

[6]     An up-to-date summary of the scholarly literature can be found in Jeffrey Usman,
*Defining Religion: The Struggle to Define Religion Under the First Amendment and the
Contributions and Insights of Other Disciplines of Study*, 83 N. Dak. L. Rev. 123 (2007), citing
and discussing the principal works appearing in the last few decades.

men in their solitude, so far as they apprehend themselves to stand in relation to whatever they may consider the divine." . . . In referring to an individual's relation to what he considers the divine, Professor James used the word "divine" in its broadest sense as denoting any object that is godlike, whether it is or is not a specific deity.

*U.S. v. Moon*, 718 F.2d 1210, 1226-27 (2d Cir. 1983) (internal citations omitted).

One common thread in all these purported tests and definitions is that, in Free Exercise cases, what matters is the subjective perspective of the *believer*, not an objective examination of whether the purportedly religious belief is shared by others or doctrinally correct. *See Patrick v. LeFevre*, 745 F.2d 153, 157 (2d Cir. 1984) ("courts have jettisoned the objective, content-based approach previously employed to define religious belief, in favor of a more subjective definition of religion, which examines an individual's inward attitudes towards a particular belief system").

This "expansive definition of religion has been developed primarily to protect an individual's free exercise of religion, recognizing that an individual's most sincere beliefs do not necessarily fall within traditional religious categories." *United States v. Allen*, 760 F.2d 447, 450 (2d Cir. 1985). "Free Exercise cases generally involve claims brought by individuals or groups claiming to belong to a cognizable religion," *Alvarado v. City of San Jose*, 94 F.3d 1223, 1227 (9th Cir. 1996), and thus necessarily involve determining whether the *claimants'* beliefs are religious.

In contrast, "Establishment cases usually, though not always, involve well known religions, because these are most likely to generate the dangers the clause is designed to prevent." *Alvarado*, 94 F.3d at 1227; *see also* George C. Freeman III, *The Misguided Search for the Constitutional Definition of "Religion"*, 71 Geo. L. Rev. 1519, 1563-64 (1983) (Establishment Clause cases turn on the meaning of "establishment," not the meaning of "religion"); Laurence H. Tribe, *American Constitutional Law*, p. 1187 (2d ed. 1988) (the meaning of "religion" rarely

13

arises in Establishment Clause cases). *But see Smith v. Bd. of Sch. Comm'rs*, 665 F. Supp. 684

(S.D. Ala.), *rev'd*, 827 F.2d 684 (11th Cir. 1987) (district court erroneously held that "secular

humanism" was a religion, that it was taught in schools, and that such teaching violated the

Establishment Clause).

In Establishment Clause cases, as opposed to Free Exercise cases, relying on the

claimants' beliefs about the religious character of the practice giving rise to litigation is

problematic, especially where the claimants "ask [the court] to recognize as a 'religion' what that

religion's alleged adherents have not identified as such." *Allen*, 760 F.2d at 450.  In a Free

Exercise case, claimants with a purely subjective and idiosyncratic viewpoint that is,

nevertheless, religious put the government to the often manageable burden of accommodating

objections to generally-applicable laws or government programs by, for example, paying

unemployment insurance to persons whose  religious beliefs prevent them from working on

particular days, *see Sherbert v. Verner*, 374 U.S. 398 (1963), or at particular jobs, *see Thomas v.

Review Bd.*, 450 U.S. 707 (1981), or exempting objecting students from flag salute ceremonies,

*see West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943), or providing a particular diet,

*see Ford v. McGinnis*, 352 F.3d 582 (2d Cir. 2003), or the time, place, and wherewithal to pray.

*See Salahuddin v. Coughlin*, 993 F.2d 306 (2d Cir. 1993).  In an Establishment Clause case, by

contrast, the claimant seeks to stop the government from enforcing its laws or pursuing its

programs at all.  *See, e.g., Engel v. Vitale*, 370 U.S. 421 (1962) (state-sponsored prayer in public

school); *Edwards v. Aguillard*, 482 U.S. 578 (1987) (teaching of "creation science" in public

schools).

Government cannot function, however, if every individual can claim that some program

or activity offends his or her subjective and idiosyncratic conception of "religion" and, in the

14

name of the Establishment Clause, bring it to a halt. *See* Steven G. Gey, *Why is Religion*

*Special?: Reconsidering the Accommodation of Religion Under the Religion Clauses*, 52 U. Pitt.

L. Rev. 75, 154 (1990) ("applying the same broad definition in establishment cases could shut

down the modern regulatory state"). The educational system is particularly vulnerable to claims

that it violates the Establishment Clause by promoting some arguably religious teaching with

which a plaintiff might disagree:

> Authorities list 256 separate and substantial religious bodies to
> exist in the continental United States. Each of them . . . has as
> good a right as this plaintiff to demand that the courts compel
> the schools to sift out of their teaching everything inconsistent
> with their doctrines. If we are to eliminate everything that is
> objectionable to any of these warring sects or inconsistent with
> any of their doctrines, we will leave public education in shreds.

*McCollum v. Bd. of Educ.*, 330 U.S. 203, 235 (1948) (Jackson, J., concurring). The threat Justice

Jackson saw to the educational system is exponentially greater when the universe of potential

claimants is expanded, as it has been in Free Exercise cases, beyond "separate and substantial

religious bodies" to subjective and idiosyncratic individual religious belief.

The Second Circuit, however, has pre-empted that exponentially expanded threat in

Establishment Clause cases by defining "religion" for Establishment Clause purposes not

subjectively and idiosyncratically, but objectively, as that which is conventionally recognized as

"religion":

> we adopt for establishment clause purposes the conventional,
> majority view, rather than the appellant's view, of what is
> religious and what is political. . . . That the Government
> advances what is, conceivably, someone's religion, however,
> does not make what most citizens consider a political or
> military action a violation of the establishment clause.

*Allen*, 760 F.2d at 450 (rejecting Establishment Clause defense to charge of destroying military

property allegedly used to advance "religion" of "Nuclearism"). The Second Circuit's approach

15

recognizes that governments generally act in response to the desires of politically significant constituencies; if they do something that establishes "religion," they generally do it in response to communally-recognized religious sentiment, not idiosyncratic, individual religious claims. It is, in addition, consistent with the Supreme Court's holding that whether a government action has the primary effect of advancing religion is determined objectively, by whether a reasonable observer would perceive the practice as having that effect. *See Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 620, 635-36, 642-43 (1989); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 75 (2d Cir.), *cert. denied*, 534 U.S. 827 (2001).

A court may rely on judicially-noticeable facts in granting a motion to dismiss. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). The "conventional, majority view" of the community on a topic of general interest – which judges, being members of the community are likely either to share or to know – is "not subject to reasonable dispute in that it is . . . generally known within the territorial jurisdiction of the trial court." Fed. R. Evid. 201(b). This Court can and should take judicial notice that, under the "conventional, majority view," what plaintiff identifies as the "religion of Feminism" is a secular point of view, not a religion. Therefore, the Establishment Clause claim must be dismissed.

**B.    Registration of Curricula and Degree Programs
That Comply With Religion-Neutral Academic Standards
Does Not Constitute an Establishment of Religion**

Whether "Feminism" is a religion or not, the actions of the Regents and the Commissioner in registering degree programs and approving curricula do not establish religion. Rather, the State applies secular, religion-neutral academic criteria to determine which educational institutions – be they secular or religious – may offer what degrees in what subjects, both secular and religious. *See* N.Y.C.R.R. Part 52 (Commissioner's Regulations).

16

To survive an Establishment Clause challenge, government practices must: (1) "have a secular legislative purpose," (2) have a "principal or primary effect . . . that neither advances nor inhibits religion," and (3) "not foster an excessive government entanglement with religion." *Lemon v. Kurtzman*, 403 U.S. 602, 612-13 (1971); *see also Altman*, 245 F.3d at 75. The State's registration and approval of degree programs and curricula easily passes all three parts of the test.

1. **Secular Purpose:** The question to be answered in determining whether the challenged activities have a secular purpose is "whether government's actual purpose is to endorse or disapprove of religion." *Edwards v. Aguillard*, 482 U.S. 578, 585 (1987). The purpose of the State's regulatory scheme for registering degree programs and approving curricula is apparent on its face. Nothing in it refers to religion.[7] The criteria governing whether to register a degree program – in either a secular or a religious subject – or to approve a curriculum, are objective, secular criteria designed to advance educational quality, and nothing else. *See* pp. 4-6, *supra*. Both secular and religious programs have been approved and both secular and religious programs have been disapproved, and for purely secular reasons each time. *See Moore*, 44 N.Y.2d 593, 407 N.Y.S.2d 452 (1978) (denying registration for Ph.D. programs in English and History); *Warder*, 53 N.Y.2d 186, 440 N.Y.S.2d 875 (1981), *cert. denied*, 454 U.S. 1125 (1981) (denying charter to seminary). Nothing in the complaint suggests that this comprehensive, secular, religion-neutral scheme to assure educational quality is nevertheless intended to advance religion. Therefore, it passes the "secular purpose" test.

2. **Primary Effect:** "For a law to have forbidden 'effects' under *Lemon*, it must be

---

[7]     Except for N.Y. Educ. Law § 207, which denies the Regents and the Commissioner the power to interfere with the academic freedom of religious institutions to determine religious orthodoxy. *See* fn. 7, *supra.*

fair to say that the *government itself* has advanced religion through its own activities and influence." *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 337 (1987) (emphasis in original).  The State's registering degree programs and approving curricula do not themselves advance religion.  At most, they permit the academic teaching of religious subjects with some assurance of quality.  It is by no means a foregone conclusion that the study even of explicitly religious subjects will enhance religious faith.  *See* Bart D. Ehrman, *God's Problem: How the Bible Fails to Answer Our Most Important Question – Why We Suffer* (2008) (prominent religious scholar explains how his scholarly explorations into the foundations of his faith led to loss of belief).  Because the State's activities neither advance nor inhibit religion, they pass the "primary effects" test.

3.   **Entanglement:**  "[T]he First Amendment rests upon the premise that both religion and government can best achieve their lofty aims if each is left free from the other within its respective sphere." *McCollum*, 333 U.S. at 212.  Entanglement issues particularly arise when the State's activities create the danger of "state inspection and evaluation of the religious content of a religious organization." *Larson v. Valente*, 456 U.S. 228, 255 (1982).  No such danger exists in this case.  The regulations that the Regents and the Commissioner enforce do not require, authorize, or even permit, examination into the religious content of curricula or courses. *See* pp 4-6, *supra*.  The examination engaged in when determining whether to register a doctoral program in theology is the same type of examination required to determine whether to register a doctoral program in American history.  If the institution has the proper resources and systems (which includes a rationally-designed curriculum), its program is registered.  Whether the theology faculty teaches Arianism or Donatism is as irrelevant to registration as whether the historian of the American South is pro- or anti-slavery.

The Commissioner and the Regents must review proposed programs before registering them, and may periodically review them for compliance with regulations, but that does not amount to excessive entanglement. *See Bowen v. Kendrick*, 487 U.S. 589, 615-17 (1988) (no excessive entanglement where government reviews adolescent counseling programs of religious institutions receiving government grants, reviews the materials used, and monitors the program by periodic visits). The State's system for registering degree programs and curricula creates no danger of religious entanglement.

**C.    Bundy Aid May be Given Even to
         Religious Institutions and Programs Without
         Violating the Establishment Clause**

Plaintiffs also contend that "the Regents and Commissioner provide direct financial aid to Columbia University under Education Law § 6401, known as 'Bundy Aid,' which benefits Columbia's women's studies program and Continuing Education in promoting the Feminism advanced by the Women's Studies program." (Compl., ¶¶ 145-47, 159-61) Bundy aid is given to all qualifying institutions (including Columbia) *per capita*, based upon the graduates produced. *See* pp. 6-7, *supra*. Plaintiffs appear to believe that this aid violates the Establishment Clause. (Compl., ¶¶ 162-63) Under the controlling Supreme Court precedent, it does not.

At the outset, however, it is unclear just what plaintiff thinks the Establishment Clause violation is. Columbia is a private, non-sectarian university. Financial aid to private, non-sectarian universities presents no Establishment Clause problem. Universities may offer courses and majors in explicitly religious subjects without violating the Establishment Clause. *See Edwards v. Aguillard*, 482 U.S. at 594. Even assuming that there is a "religion of Feminism," and the women's studies department at Columbia teaches about it – and the complaint alleges nothing more – aid to Columbia would not violate the Establishment Clause.

19

Whatever plaintiff's theory may be, even direct financial aid to sectarian institutions that teach explicitly religious subjects presents no Establishment Clause issue so long as the aid: (1) has a secular purpose, (2) neither results in religious indoctrination by government nor defines its recipients by reference to religion, and (3) does not create excessive entanglement. *See Mitchell v. Helms*, 530 U.S. 793, 807 (2000); *Agostini v. Felton*, 521 U.S. 203, 222-23 (1997). Because Bundy aid is given to all qualifying institutions of higher education, *see* pp. 6-7, *supra*, and involves nothing more than the cutting of a check and periodic review to see that the qualifying institutions continue to qualify, there can be no serious question concerning either the first prong of the test, secular purpose, or the third prong of the test, entanglement. The only issues warranting discussion are whether Bundy aid results in religious indoctrination by government or defines its recipients by reference to religion.

      **1.**    **Religiously-Neutral Definition of Beneficiaries:**  Bundy aid is distributed to any qualifying institution of higher education, based solely on the number and type of degrees earned. *See* N.Y. Educ. Law § 6401(3). The religious affiliation, if any, of either the student or the institution is irrelevant. It cannot, therefore, be said that the State defines Bundy aid recipients by reference to religion. *See Mitchell*, 503 U.S. at 830 (upholding aid program directed to a "[b]road array of schools eligible for aid without regard to their religious affiliations or lack thereof" based on enrollment); *Agostini*, 521 U.S. at 231 (noting that Court has "sustained programs that provided aid to *all* eligible children regardless of where they attend school").

      **2.**    **No Indoctrination by the Government:**  The key issue is whether an institution's use of government aid to indoctrinate students in religion is attributable to the government. *See Agostini*, 521 U.S. at 230. Where, as here, "the religious, irreligious, and a-religious alike are eligible for governmental aid, no one would conclude that any indoctrination

that any particular recipient conducts has been done at the behest of the government." *Mitchell*, 530 U.S. at 809.

Furthermore, because the aid is given in a non-discriminatory fashion and is based entirely on where students choose to go to college and whether they graduate, it follows that students' private choices, not governmental action, determine whether the students are exposed to religious indoctrination. *See Mitchell*, 530 U.S. at 810 ("if numerous private choices, rather than the single choice of a government, determine the distribution of aid pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment"). If Bundy aid were distributed in a way that created incentives for students to prefer colleges or universities where they might undergo religious indoctrination, an Establishment Clause issue might arise, but "[t]his incentive is not present . . . where the aid is allocated on the basis of neutral, secular criteria that neither favor nor disfavor religion, and is made available to both religious and secular beneficiaries on a nondiscriminatory basis." *Agostini*, 521 U.S. at 231.

Private colleges and universities in New York State, whether secular or religious, receive the same dollar amount of Bundy aid per student, per degree. Aid distributed on this basis creates no economic incentive that would cause a student to prefer a religious over a secular school, or vice versa. The aid, if large enough, might create an incentive for a student to attend *some* college rather than none at all, but the Bundy aid distribution formula does not tilt the playing field or otherwise influence the students' private choice of which college to attend. Using state money to facilitate such private choice does not violate the Establishment Clause. "If aid to schools, even 'direct aid,' is neutrally available and, before reaching or benefitting any religious school, first passes through the hands (literally or figuratively) of numerous private

21

citizens who are free to direct the aid elsewhere, the government has not provided any 'support of religion.'" *Mitchell*, 530 U.S. at 816 (upholding government aid to private schools, including religious schools, distributed on the basis of enrollment).

**D.   Because HESC Provides Grants and Loan Guarantees to Students Rather Than Institutions, its Activities Do Not Violate the Establishment Clause**

The crux of plaintiff's complaint about HESC is that it guarantees loans or awards grants to students who may, ultimately, go to Columbia and take women's studies courses. (Compl., ¶¶ 119, 160, 162) Because HESC's programs work by giving aid to individual students, not institutions, however, the independent choices of those students about which institutions and programs to attend insulate HESC from an Establishment Clause challenge.

Providing generally-available financial aid to students who choose to attend religiously-affiliated colleges or pursue explicitly religious studies is permitted under the Establishment Clause. *See Witters v. Washington Dep't of Servs. for the Blind*, 474 U.S. 481, 485-89 (1986) (Establishment Clause does not forbid use of generally-available vocational education aid to student planning to study for ministry). *See also Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) ("where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause."); *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1253 (10th Cir. 2008) ("It is now settled that the Establishment Clause permits evenhanded funding of education – religious and secular – through student scholarships.").

HESC administers financial aid and guarantees loans to *students* pursuing higher

education at qualifying institutions. *See* p. 8, *supra*. Students are free to use the grant or loan proceeds – only some of which are state funds – at any qualifying institution for any qualifying educational program. (*Id*.) Students may use the proceeds to attend religiously-affiliated colleges and take explicitly religious courses. (*Id*.) As a provider of generally-available aid to students who make their own independent, private educational choices, HESC comes squarely within the *Witters-Zelman* rule, which requires that the Establishment Clause claim against HESC be dismissed.

## CONCLUSION

For the reasons given, the complaint against the State Defendants should be dismissed, with prejudice, together with costs, disbursements, attorneys' fees, and such further relief as the Court deems just and proper.

Dated: New York, New York
      January 17, 2011

                           Respectfully submitted,

                           ERIC T. SCHNEIDERMAN
                           Attorney General of the
                             State of New York
                           <u>Attorney for State Defendants</u>
                           By:
                                 ***Clement J. Colucci***

                           _____
                           CLEMENT J. COLUCCI
                           Assistant Attorney General
                           120 Broadway
                           New York, New York 10271
                           (212) 416-8634
                           Clement.Colucci@ag.ny.gov

23