UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------x

Roy Den Hollander,                                             Docket No.
                                                              10 CV 9277
        Plaintiff on behalf of himself and all others        (LTS)(HBP)(ECF)
        similarly situated,


                -against-


Members of the Board of Regents of the University of the State of
       New York, in their official and individual capacities;
Chancellor of the Board of Regents, Merryl H. Tisch, in her official
       and individual capacity;
New York State Commissioner of the Department of Education,
       David M. Steiner, in his official and individual capacity;
Acting President of the New York State Higher Education Services
       Corp., Elsa Magee, in her official and individual capacity;
U.S. Department of Education; and
U.S. Secretary of Education, Arne Duncan, in his official capacity;

        Defendants.
-------------------------------------------------------------------------------x


## MEMORANDUM OF LAW IN OPPOSITION TO THE STATE AND U.S. DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT

Roy Den Hollander
Attorney and Class Representative
545 East 14 Street, 10D
New York, N.Y. 10009
Tel.: (917) 687-0652
Email:  rdhhh@yahoo.com

# TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................. 1

FACTS .......................................................................................................................... .... 2

ARGUMENTS ...................................................................................................................... 4

I.    RES JUDICATA or CLAIM PRECLUSION

The Establishment Clause claim in *Den Hollander I* was dismissed for lack of subject matter jurisdiction (standing), which was <u>not</u> a decision or adjudication on the merits, so res judicata, or claim preclusion, does <u>not</u> bar this subsequent action…………………………….….…… 4

II.   COLLATERAL ESTOPPEL or ISSUE PRECLUSION

Collateral estoppel, or issue preclusion, does <u>not</u> bar the Establishment Clause claim in this action because that claim in the prior action, *Den Hollander I,* was dismissed for failure to allege the jurisdictional fact that the Class Representative is a taxpayer while this action, *Den Hollander II,* alleges that jurisdictional fact……………………………………………..…… 5

III.  PLAUSIBILITY STANDARD FOR RULES 12(b)(1) AND 12(b)(6)……………..…… 7

IV.   FOR ESTABLISHMENT CLAUSE PURPOSES, THE COMPLAINT PLAUSIBLY ALLEGES THAT THE CLASS REPRESENTATIVE SATISFIES BOTH TAX-PAYER AND NON-ECONOMIC STANDING UNDER RULE 12(b)(1)………..…… 9

   A. Taxpayer Standing…………………………………………………………………… 10

   B. Non-economic Standing…………………………………………….………………... 11

V.    THE COMPLAINT PLAUSIBLY ALLEGES UNDER RULE 12(b)(6) THAT FEMINISM IS A RELIGION AND THE STATE AND U.S. DEFENDANTS AID IT IN VIOLATION OF THE ESTABLISHMENT CLAUSE………………………… 13

   A. Feminism is a religion under Establishment Clause analyzes used by the U.S. Supreme Court and the Third, Fourth, Eighth, Ninth, and Tenth Circuit Courts of Appeals….…… 13

   B. The State's higher education policies on their face have the purpose of promoting and favoring the religion Feminism and entangle the State in the implementation of Feminist tenets in higher education at Columbia University…………………………..…… 16

   C. The State and the U.S. Department of Education's institutional financing of Columbia's IRWG have the effect of advancing the religion Feminism……………… 21

CONCLUSION ................................................................................................................ 25

## PRELIMINARY STATEMENT

This action ("*Den Hollander II*") is a putative class action[1] that alleges only Establishment Clause violations by (1) the University of the State of New York ("USNY"),[2] which is comprised of the Regents, Department of Education ("SED"), and the Higher Education Services Corporation ("HESC"), collectively the "State," and (2) the U.S. Department of Education ("USDOE").  The Class Representative is Roy Den Hollander.[3]  A prior action ("*Den Hollander I*") that alleged Equal Protection, Title IX, and Establishment Clause violations was dismissed for lack of standing under Fed. R. Civ. P. 12(b)(1).  (Den Hollander Decl. ¶¶ 1-5 ("DH Decl.")).  *Den Hollander I* was <u>not</u> dismissed for failure to state a claim under Rule 12(b)(6) as the State wrongly implies with its statement "dismissed … on the merits," State Memorandum of Law p. 2 ("State Memo.").  The Magistrate Judge, District Court Judge, and Court of Appeals' Judges all dismissed or affirmed dismissal of *Den Hollander I* for lack of subject matter jurisdiction, or standing, under Rule 12(b)(1) because *Den Hollander I* failed to allege the jurisdictional fact that the Class Representative is a taxpayer, which the Complaint in this action, *Den Hollander II*, corrects.[4]  ("DH Decl. ¶¶ 1-5).  Therefore, *res judicata*, or claim preclusion, and collateral estoppel, or issue preclusion, do <u>not</u> apply.

*Den Hollander II* provides additional allegations to the Establishment Clause claim and corrects an error pointed out by Judge Calabresi in oral argument before the Second Circuit Court of Appeals that the complaint in *Den Hollander I* failed to allege that the Class Representative had taxpayer status.  (DH Decl. Ex. E, Transcript of Oral Argument,  pp. 2, 5; and

---

[1] Putative class actions are treated as class actions for dismissal purposes until a determination is made on class certification.  *Gaddis v. Wyman*, 304 F. Supp. 713, 715 (S.D.N.Y. 1969).  No determination on class certification was made in *Den Hollander I*; therefore, it is not precluded in this action.

[2] This is not to be confused with S.U.N.Y.  (*See* Compl. ¶¶ 18-19).

[3] The class representative's last name is Dutch, so it consists of the two words "Den Hollander."

[4] The State and USDOE also contend that after the Establishment Clause claim was dismissed for lack of subject matter jurisdiction (standing), the lower court went ahead and exercised subject matter jurisdiction anyway to dismiss under Rule 12(b)(6), such is a legal impossibility.

*see* Second Circuit Summary Order, Ex. D pp. 3-4 )("Nor has plaintiff made out the requirements

for taxpayer standing for his Establishment Clause claim.").

## FACTS

The State's policy and procedures for promoting Feminism in higher education is detailed

in *Equity for Women in the 1990s, Regents Policy and Action Plan, Background Paper*

(1993)(the document contains two papers separately cited as *Equity for Women-Action Plan* or

*Equity for Women-Background Paper*).  (DH Decl. Ex. H; Compl. ¶¶ 99-106).

The State and USDOE expend public funds appropriated by the New York Legislature,

the Regents, and Congress that further the propagation of Feminism at Columbia University's

Institute for Research on Women and Gender ("IRWG").

The State in its Memorandum section titled "Facts" mistakenly tries to limit its influence

and involvement in higher education and at Columbia University ("Columbia") and IRWG.

(State Memo. pp. 5-7).  While admitting that curricula must be approved and registered, the State

makes the false implication that individual courses escape the State's approval and fall outside

the registration process.  (State Memo. p. 6 n.5).  The State's Education Regulations define

curriculum in the following way:

> "Curriculum means a sequence of <u>courses</u> which together comprise a program of instruction," 8 N.Y.C.R.R. § 126.1(d)(emphasis added);

> "Curriculum or program means the formal educational requirements necessary to qualify for certificates or degrees.  A curriculum or program includes general education or specialized study in depth in a particular field, or both," 8 N.Y.C.R.R. § 50.1(i).

Under these definitions, the State cannot approve a curriculum for registration unless it

approves the courses that are included in that curriculum.  That is why the regulations require the

2

"objectives of each curriculum and its courses shall be well defined in writing," and "[c]ourse description shall clearly state the subject matter and requirements of each course."  8 N.Y.C.R.R. § 52.2(c)(1).  It is also the reason that to register curricula, "[t]he content and duration of curricula shall be designed to implement" a curriculum's purposes.  8 N.Y.C.R.R.  § 52.1(b)(3).

Since courses make up part of a curriculum, the State's policies clearly reach into the content of instruction in higher education and IRWG's Feminist inculcating Women's Studies Program to which the State repeatedly gives its stamp of approval.  (Compl. ¶¶ 23, 30).

There is one exception, however, to the State reviewing and approving course content and that is theological instruction.  N.Y. Educ. Law § 207.  The State raises this exception in order to boot-strap an argument that because the State is prohibited from regulating doctrinal instruction in seminaries, State Memo. p. 5 n.4, and because the regulations for approving curricula are, the State claims, "religion-neutral," State Memo. p. 6, the Feminist doctrine in State policies and propagated at IRWG cannot be a religion because the State is involved.  That does <u>not</u> mean Feminism is <u>not</u> a religion.  Governments often do things inconsistent with the written law.  After all, the Establishment Clause has been violated by governments before.  *E.g. McCreary County v. ACLU*, 545 U.S. 844 (2005); *Lee v. Weisman*, 505 U.S. 577 (1992).

The State's representation that its registration and approval procedures are the same for both secular and religious institutions, or neutral, is false.  (State Memo. pp. 6, 16-18).  For if they were, then there would be no need for the sentence quoted in the State Memo., p. 5 n.4, which is taken from N.Y. Educ. Law § 207 that specifically craves out an area—a religious area—in which the State's authority over content is prohibited.  If Feminism is a religion, then the State enters that area in its policies by requiring adherence to Feminist tenets in higher

education and enters that area at IRWG by repeatedly approving IRWG's Feminist instruction. As a result, the State not only violates its own law but that of the First Amendment.

Other pertinent facts are in the Declaration of Roy Den Hollander.

## ARGUMENTS

**I.  The Establishment Clause claim in *Den Hollander I* was dismissed for lack of subject matter jurisdiction (standing), which was <u>not</u> a decision or adjudication on the merits, so *res judicata,* or claim preclusion, does <u>not</u> bar this subsequent action.**

*Res judicata*, or claim preclusion, requires a final judgment that was rendered on the merits.  *Hughes v. U.S.*, 71 U.S. 232, 237 (1866).  The Second Circuit continues to follow this rule.  *EDP Med. Computer Sys. v. U.S.*, 480 F.3d 621, 624 (2d Cir. 2007)(quoting *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985)(the doctrine bars "later litigation if [an] earlier decision was … a final judgment on the merits….")).

Dismissal for lack of subject matter jurisdiction is not a judgment on the merits; therefore, it has no *res judicata*, or claim preclusive, effect.  *Thomas v. County of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994).  "If … [a] suit was dismissed for … want of jurisdiction, or was disposed of on any ground which did not go to the merits of the action, the judgment rendered will prove no bar to another suit."  *Hughes*, 71 U.S. at 237.  Since standing is one of the most important of the jurisdictional doctrines, *U.S. v. Hays*, 515 U.S. 737, 742 (1995),  a dismissal for lack of standing is not a judgment on the merits, *see Evac, LLC v. Pataki*, 89 F. Supp. 2d 250, 261 n.4 (N.D.N.Y. 2000).

The *Restatement (Second) of Judgments* does not use the terminology "on the merits" but states at § 20:

> A personal judgment for the defendant, although valid and final, does not bar another action by the plaintiff on the same claim:
> (a) When the judgment is one of dismissal for lack of jurisdiction, ….

In addition, Fed. R. Civ. P. 41(b) supports the proposition that a dismissal for lack of subject matter jurisdiction will not bar a subsequent action because such a ground "is so plainly based on a threshold determination that a specification that the dismissal will be a bar should ordinarily be of no effect." *Restatement (Second) of Judgments* § 20, Comment *d*.

Once the District Court dismissed *Den Hollander I* for lack of standing, it no longer had subject matter jurisdiction; that is, the authority to rule that the Establishment Clause claim was also dismissed on the merits under Rule 12(b)(6). "Jurisdiction, whether it be subject-matter or personal, concerns the authority of the court to hear and determine the controversy." *Local 538 United Bhd. of Carpenters & Joiners v. U.S. Fid. & Guar. Co.*, 154 F.3d 52, 55 (2d Cir. 1998). Without it, a court lacks the power to adjudicate an action. *U.S. ex rel. Rudick v. Laird*, 412 F.2d 16, 20 (2d Cir. 1969). So when the District Court Judge wrote "[t]he Establishment Clause claims are dismissed also on the alternative ground that they are absurd and utterly without merit," Ex. C p. 2, the Court had no jurisdiction to make that decision. This action, therefore, is not barred by *res judicata*, or claim preclusion.

**II.  Collateral estoppel, or issue preclusion, does <u>not</u> bar the Establishment Clause claim in this action because that claim in the prior action, *Den Hollander I,* was dismissed for failure to allege the jurisdictional fact that the Class Representative is a taxpayer while this action, *Den Hollander II,* alleges that jurisdictional fact.**

Second Circuit Judge Calabresi emphasized during oral argument in *Den Hollander I* that the jurisdictional allegation of the Class Representative having taxpayer status was never put in issue because the complaint had not specifically allege it.  (DH Decl. Ex. E, pp. 2, 5).

The absence of that jurisdictional allegation meant the Class Representative's Establishment Clause taxpayer standing arguments were not properly before the Court. "The first suit was therefore dismissed, because the declaration did not state the jurisdictional facts upon which the right of the court to entertain the suit was brought.  In other words, the case was

dismissed for a defect in pleading.  In the present suit [*Den Hollander* II] the defect of the declaration in the first suit is supplied."  *Smith v. McNeal*, 109 U.S. 426, 431 (1883); *see also Costello v. United States*, 365 U.S. 265, 285 (1961)(collateral estoppel does <u>not</u> apply to "those dismissals which are based on a plaintiff's failure to comply with a precondition requisite to the Court's going forward to determine the merits of his substantive claim").

The Second Circuit agrees that dismissal for failure to allege a jurisdictional fact will not prevent a subsequent action in which the jurisdictional fact is alleged.  *Ripperger v. A. C. Allyn & Co.*, 113 F.2d 332, 333-334 (2d Cir. 1940), *cert. denied*, 311 U.S. 695.  In *Ripperger*, the Second Circuit relied on *Smith* and described that decision as when "the first suit was dismissed because the complaint did not allege the requisite jurisdictional facts, … the dismissal was held to be no bar to a second suit in the same court in which the complaint did state them."  *Id*. at 333. The Court in *Ripperger* did not allow a second suit because "both complaints [were] alike except for [a] non-jurisdictional allegation in the second complaint…."  *Id.* at 333-334.

The Second Circuit Court re-affirmed this rule in *York v. Guaranty Trust Co.*, 143 F.2d 503 (1944), *overruled on other grounds*, 326 U.S. 99 (this Supreme Court case was later abandoned in *Hanna v. Plumer*, 380 U.S. 460 (1965)).  The Second Circuit Court stated in *York*:

> As appears from *Ripperger v. A.C. Allyn & Co.* and *Smith v. McNeal*, a prior decision dismissing a suit on the mere pleadings for lack of jurisdiction is not a bar to a second suit alleging sufficient jurisdictional facts which existed when the first suit was pending but which were not therein alleged.  *Cf. Wiggins Ferry Co. v. Ohio & M.R. Co.*, 142 U.S. 396, 410 (1892); *Sylvan Beach v. Koch*, 140 F.2d 852, 860 (8th Cir. 1944); *Dennison Mfg. Co. v. Scharf Tag, Label & Box Co.*, 121 F. 313, 318 (6th Cir. 1903).

*York* at 519 n.21.

The U.S. Court of Federal Claims has also held that "even when actually litigated and decided, the jurisdictional determinations underlying a dismissal do not have preclusive effect if

after the initial dismissal, plaintiff has 'cured' the jurisdictional deficiency identified in the first suit." *Lowe v. U.S.*, 79 Fed. Cl. 218, 229 (Fed. Ct. Cl. 2007)(citations omitted); Restatement (Second) Judgments § 20(2).  A "prior dismissal *does* preclude the same action based on the same facts unless the jurisdictional flaw that necessitated dismissal of the first suit has been cured." *Id.* at 230 (emphasis in the original).  "If the alleged 'cure' is sufficient to repair the prior jurisdictional defect, collateral estoppel does <u>not</u> apply to the prior jurisdictional determination because the issue of the court's subject matter jurisdiction over the case as situated post-'cure' has not yet been litigated." *Id.* at 230 (emphasis added).  In *Lowe* the curable defect exception did not apply because the new fact was irrelevant to the issue of whether the court had subject matter jurisdiction, and therefore could not cure the jurisdictional deficiency found in the prior case.

The Complaint in this action, *Den Hollander II*, however, does cure the jurisdictional defect in *Den Hollander I* by pleading that the Class Representative has taxpayer status and including the pertinent New York Legislature and Congressional mandates.  It was the lack of such allegations which resulted in the dismissal for lack of taxpayer standing under the Establishment Clause claim in *Den Hollander I*.  *Den Hollander v. Inst. For Research on Women & Gender*, 372 F. App'x 140, 142 (2d Cir. 2010).  Collateral estoppel, or issue preclusion, therefore, does not bar a determination on the issue of taxpayer standing in this proceeding.

### III.  The plausibility standard applies to both Rules 12(b)(1) and 12(b)(6).

A number of courts are beginning to apply the plausibility standard to Rule 12(b)(1) motions to dismiss, along with its required application to Rule 12(b)(6) motions.  *E.g. Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260-1261 (11th Cir. 2009).

The plausibility standard requires "a complaint with enough *factual* matter (taken as true) to suggest that" the elements of the cause of action are satisfied.  *Arista Records LLC v. Doe*, 604 F.3d 110, 120 (2d Cir. 2010)(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 556, 570 (2007)). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. at 556).

In addition, the plausibility standard "does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant …or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records LLC*, 604 F.3d at 120 (internal quotations and citations omitted).

A court's determinations are context-specific.  *Iqbal*, 129 S. Ct. at 1950; *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009).  Further, a court may consider any statements or documents incorporated into the complaint by reference, such as in this case the State's *Equity for Women, Regents Policy and Action Plan* and other documents referred to in the Complaint at ¶¶ 18-19, 27, 31, 39, 55, 59-62, 64-68, 94-109, 120-124, 132, 153-160 and  DH Decl. Exs. F-Q.  *Patane v. Clark*, 508 F.3d 106, 112 (2d Cir. 2007); *see Twombly*, 550 U.S. at 569 n. 13.  A court may also consider public records of a legal nature and documents possessed by or known to the Class Representative and upon which he relied in bringing the suit.  *Id*.

According to the Supreme Court, the analysis begins with "taking note of the elements a plaintiff must plead to state a claim …," *Iqbal*, 129 S. Ct. at 1947, then proceeds in two steps:

1.  Identifying the specific allegations in a complaint that are not entitled to the

presumption of truth.  *Iqbal*, 129 S. Ct. at 1950-1951; *Hayden v. Paterson*, 594 F.3d 150, 161 (2d

Cir. 2010).  Those are statements that cut and copy the elements of a cause of action; that is, they

are conclusory.  *Twombly*, 550 U.S. at 555.  The allegations should be more than an unadorned:

the-defendant-unlawfully-harmed-me accusations.  *Iqbal*, 129 S. Ct. at 1949.  Some legal

conclusions, however, are permissible when the defendants are given notice of the date, time and

place of the alleged illegal conduct.  *Iqbal v. Hasty*, 490 F.3d 143, 156 (2d Cir. 2007), *rev'd sub*

*nom. on other grounds*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

2.  Next, the analysis considers the remaining factual allegations in a complaint as true and

determines if they plausibly—not probably but more than possibly— infer that the defendant is

liable for the misconduct alleged.  *Iqbal*, 129 S. Ct. at 1950; *Twombly*, 550 U.S. at 556; *Hayden*

*v. Paterson*, 594 F.3d at 161.  In doing so, the courts "draw[] all inferences in favor of the

plaintiff," *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 692 (2d Cir. 2009), and

a complaint cannot be dismissed based on a judge's disbelief of the factual allegations even if it

strikes a judge that actual proof is improbable.  *Twombly*, 550 U.S. at 556.

**IV.  For Establishment Clause purposes, the Complaint plausibly alleges that the Class**
**Representative satisfies both taxpayer and non-economic standing requirements under**
**Rule 12(b)(1).**

For Establishment Clause standing, the injury requirement is the "linchpin."  *Cooper v.*

*United States Postal Serv.*, 577 F.3d 479, 489 (2d Cir. 2009).  Injury for standing under the

Establishment Clause comes in two forms:  (1) where "a broad swath of litigants can

demonstrate standing under *Flast v. Cohen*, 392 U.S. 83 (1968), which permits litigants to raise

claims on the ground that their 'tax money is being extracted and spent in violation of specific

constitutional protections,'" *Cooper* 577 F.3d 489 n.9 (internal quotation *Flast* at 106), or (2)

where non-economic injury comes from exposure to religious communications, *Cooper* at 490. Whether Feminism is a religion is not a standing issue, since that issue goes to the merits of this case.  *See Spencer v. Casavilla*, 903 F.2d 171, 173 (2d Cir. 1990).

A.  Taxpayer Standing

Under *Flast*, a taxpayer "asserting an Establishment Clause claim has standing to challenge a law authorizing the use of federal funds in a way that allegedly violates the Establishment Clause."  *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 593 (2007). The Establishment Clause also applies to the states through the 14th Amendment, so a state taxpayer may challenge state funding.  *DeStefano v. Emergency Hous. Group*, 247 F.3d 397, 405 (2d Cir. 2001)(citations omitted).

The Complaint at ¶¶ 6 and 13 alleges the Class Representative is a federal and N.Y. State taxpayer and DH Decl. Ex. F provides 1099 tax forms from 2010, when the Complaint was filed, and 2011.

In addition to a plaintiff's taxpayer status, taxpayer standing requires the activities at issue be conducted in accordance with a legislative mandate, their funding come from specific legislative appropriations, and the challenged governmental activities exceed constitutional limitations imposed upon the exercise of a government's taxing and spending power.  *Hein*, 551 U.S. at 603-605; *DeStefano*, 247 F.3d at 405.

A governmental activity may be challenged on its face or as applied.  *Bowen v. Kendrick*, 487 U.S. 589, 618-619 (1988); *Lamont v. Woods*, 948 F.2d 825, 830 (2d Cir. 1991)(taxpayer standing to challenge the way appropriated funds were disbursed).  In "as applied" challenges, the Supreme Court has held standing exists whether or not the language in the statute specifically mentions the role of sectarian organizations. *Lamont v. Schultz*, 748 F. Supp. 1043, 1047

(S.D.N.Y. 1990).  The plaintiffs in *Flast* did not challenge a statutory directive of funds to private schools, but rather the actual delivery of some of the funds to sectarian schools, which was an executive decision authorized by legislation.  *Flast*, 392 U.S. at 86.

The Establishment Clause challenges in this case are a combination of "facial" and "as applied."  The Regents' policies, such as *Equity for Women-Action Plan*, facially inculcate Feminism into higher education.  (Compl. ¶¶ 92-107).  The promulgation of Regent policies are mandated by the State Legislature and specific funds are appropriated to USNY for the enforcement of the Regents' policies.  (Compl. ¶¶ 21, 24-27).  The "as applied" challenges include SED's disbursement to IRWG, an admittedly Feminist institution, of Bundy aid that is mandated and appropriated by the State Legislature for higher education.  (Compl. ¶¶ 32, 33, 74).  Also an "as applied" challenge concerns USDOE's disbursement of Congressional appropriations to IRWG in the form of financial awards, contracts, and research grants.  (Compl. ¶ 148).

B.  Non-economic Standing

Standing also exists where non-economic injury comes from exposure to religious communications.  *Cooper*, 577 F.3d at 489 n.9 (2009); *Sullivan v. Syracuse Housing Authority*, 962 F.2d 1101, 1108 (2d Cir. 1992); *Am. Atheists, Inc. v. Duncan*, 616 F.3d 1145, 1152-53 (10th Cir. 2010).  The Supreme Court specifically has recognized that a party "may have a spiritual stake in First Amendment values sufficient to give standing to raise issues concerning the Establishment Clause."  *Sullivan*, 962 F.2d at 1107 (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970)).  Such exposure to an unwelcome religious communication works a personal injury distinct from and in addition to each citizen's general

11

grievance against unconstitutional government conduct.  *Suhre v. Haywood County*, 131 F.3d 1083, 1086 (4th Cir. 1997).

In *Sullivan*, this Court found that the plaintiff had a "direct and personal stake in [the] controversy" because (1) the operation of a religious after-school program in a community center deprived the plaintiff of his right to use and enjoy the center, (2) the plaintiff found the alleged establishment of religion offensive, and (3) the program brought religion into a place functionally similar to the plaintiff's home.  *Sullivan*, 962 F.2d at 1108.

In *Cooper*, the Second Circuit found non-economic standing where the plaintiff (1) came into "direct contact with religious displays that were made a part of his experience in using the postal facility nearest his home," (2) such contact made him uncomfortable, and (3) to avoid contact, he would have to alter his behavior.  *Cooper*, 577 F.3d at 491.

As an alumnus of Columbia's Business School, the Class Representative continues to take advantage of his alumni rights and privileges.  http://alumni.columbia.edu.  Among these are using Columbia for library resources, career networking, e-mail services, discussion groups, career support, access to Columbia publications, attending various events, discounts and special offers, electronic learning, and pod-casts to listen to the newest ideas on campus.  Complaint ¶ 82.  As a result, the Class Representative (1) frequently comes into direct contact with Feminism at Columbia, which interferes with his use and enjoyment of his alma mater; (2) he finds the communications of Feminist doctrine offensive and inappropriate, and (3) the State's policies, and the State and USDOE's funding for IRWG have interjected the modern-day religion of Feminism into an important section of the Class Representative's life, which even enters his

home through mailings[5] and the Internet and in order to avoid would require altering his

behavior.  (Complaint ¶¶ 79-90).

**V.  The Complaint plausibly alleges under Rule 12(b)(6) that Feminism is a religion and the State and USDOE aid it in violation of the Establishment Clause.**

A.  Feminism is a religion under Establishment Clause analyzes used by the U.S. Supreme Court and the Third, Fourth, Eighth, Ninth, and Tenth Circuit Courts of Appeals.

The Complaint alleges that under decisions of the U.S. Supreme Court; the Third, Fourth,

Eighth, Ninth, and Tenth Circuit Courts of Appeals;[6] Title VII of the Civil Rights Act of 1964;

and a case from the Southern District of New York, the belief system Feminism, as propagated

and aided by the defendants, satisfies the tests for being a religion.

The Supreme Court ruled decades ago in two conscientious-objector cases that the test

for determining whether a belief system is religious is that it "stems from … moral, ethical, or

religious beliefs about what is right and wrong and that these beliefs be held with the strength of

traditional religious convictions."  *Welsh v. U.S.*, 398 U.S. 333, 339-340 (1970); *U.S. v. Seeger*,

380 U.S. 163, 176, 186 (1965).  "If an individual deeply and sincerely holds beliefs that are

purely ethical or moral in source and content but that nevertheless impose upon him a duty of

conscience … those beliefs certainly occupy in the life of that individual 'a place parallel to that

filled by . . . God' in traditionally religious persons.  Because his beliefs function as a religion in

his life …."  *Welsh*, 398 U.S. at 340 (internal quotes *Seeger*, 380 U.S. at 176).  "'[I]ntensely

personal' convictions which some might find 'incomprehensible' or 'incorrect' come within the

meaning of 'religious belief'…."  *Welsh*, 398 U.S. at 339 (internal quotes *Seeger*, 380 U.S. at

---

[5] In *Saladin v. City of Milledgeville*, 812 F.2d 687, 692-93 (11th Cir. 1987), the receipt of correspondence bearing offensive religious communication was a sufficient injury for standing.
[6] *Africa v. Pennsylvania*, 662 F.2d 1025 (3rdCir. 1981); *Dettmer v. Landon*, 799 F.2d 929 (4th Cir.  1986); *Love v. Reed*, 216 F.3d 682 (8th Cir. 2000); *Alvarado v. City of San Jose*, 94 F.3d 1223 (9th Cir. 1996); and U. S. v. Meyers, 95 F.3d 1475 (10th Cir. 1996).

184-185).  Even the ethical beliefs of an atheist who does not believe in an afterlife are considered religious.  *U.S. v. Bush*, 509 F.2d 776, 780, 782-783 (7th Cir. 1975).

The Equal Employment Opportunity Commission in Title VII employment cases considers as religion moral or ethical beliefs sincerely held with the strength of traditional religions.  29 C.F.R. §1605.1; LaViolette v. Daley, E.E.O.C. No. 01A01748 (Sept. 13, 2002).  In addition, the Equal Employment Opportunity Act, 42 U.S.C. § 2000e(j), defines the term "religion" as including "all aspects of religious observance and practice, as well as belief."

Religion is not merely a matter of personal preference, but is shared by an organized group, and intimately related to daily living.  *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972).  *Yoder* cites to Justice Harlan's concurring opinion in *Welsh* that religion is more than devotion "to individual principles acquired on an individualized basis"; that it involves "shared beliefs by a recognizable and cohesive group."  *Welsh*, 398 U.S. at 353.  The Feminism mandated by the Regents' polices and propagated at IRWG is a well organized, far reaching belief system of widely accepted tenets that directs daily activities in how to educate, live, work, and relate to others.  (Compl. ¶¶ 50, 53-69, 92-110).

The New York Southern District Court in *Altman v. Bedford Cent. School Dist.*, 45 F.Supp.2d 368, 378, (S.D.N.Y. 1999), *rev'd on other grounds,* 245 F.3d 49 (2d Cir. 2001), *cert* denied, 534 U.S. 827, determined whether a belief system was religion for Establishment Clause proposes by using the Establishment Clause analysis from *Malnak v. Yogi*, 592 F.2d 197, 208-210 (3d Cir. 1979)(Adams, J. concurring).  Judge Adams's guidelines have been followed by the Third, Fourth, Eighth, Ninth, and Tenth Circuit Courts of Appeals.

The *Malnak* test looks at three indicia:  whether the belief-system (1) addresses fundamental and ultimate questions having to do with deep and imponderable matters, (2) is

comprehensive in nature, (3) has formal and external signs such as structure, organization, efforts at propagation, and observance of holidays.  Not all of the indicia need be satisfied for a belief system to be a religion, but in the case of the Feminism promoted by the State and financially aided by the State and USDOE, all three are.  (Compl. ¶¶ 50, 53-69, 92-110).

The State and USDOE claim that the definition of religion is "narrower" in Establishment Clause cases, State Memo. pp. 13-15; USDOE Memo. p. 2 n.3, even though the courts have never ruled such, *Alvarado v. City of San Jose*, 94 F.3d 1223, 1230 n.6 (9th Cir. 1996).  USDOE and the State, however, try to find support for a narrower definition from the criminal case *U.S. v. Allen*, 760 F.2d 447 (2d Cir. 1985).  But the *Allen* court did not rule on that issue, rather it held there was no aiding of religion.  *Allen* at 452.  In addition, Third Circuit Judge Adams, in his concurring opinion in *Malnak*, 592 F.2d at 211-212, concluded it was difficult to justify a reading of religion as narrower for Establishment Clause purposes.  Judge Adams referred to the logic of Justice Rutledge:

> "Religion" appears only once in the [First] Amendment.  But the word governs two prohibitions and governs them alike.  It does not have two meanings, one narrow to forbid "an establishment" and another, much broader, for securing "the free exercise thereof."

*Everson v. Bd. of Educ.*, 330 U.S. 1, 32 (1947)(Rutledge, J., dissenting).

The State also requests this Court to take judicial notice that the Feminism promote by the State in higher education and financially aided by the State and USDOE at IRWG is not a religion.  (State Memo. p. 16).  To establish an adjudicative fact by judicial notice requires a "high degree of indisputability …."  *Advisory Committee Note*, Fed. R. Evid. 201, subdivision (a).  That "high degree" does not exist in this case, especially where both sides are in dispute over a core issue of the merits as to whether Feminism is a religion.  *See also* Fed. R. Evid. 201(b).

Determining whether Feminism is a religion is more appropriate for a summary judgment motion or trial—not a motion to dismiss under Rule 12(b)(6). Rule 12(b)(6) allegations cannot be dismissed even if the Court considers them "chimerical" or "extravagantly fanciful." *Iqbal*, 129 S. Ct. at 1951. The Complaint's allegations raise a reasonable likelihood that discovery will show Feminism as a moral and ethical belief system consistent with religion as found in Supreme Court, Courts of Appeals, Southern District of New York, and Title VII cases.

B.   The State's higher education policies on their face have the purpose of promoting and favoring the religion Feminism and entangle the State in the implementation of Feminist tenets in higher education.

The State Legislature was mandated by the State Constitution to create and by implication fund the "corporation" named the University of the State of New York ("USNY"). *N.Y. Constitution*, Art. XI § 2. USNY is governed by the Regents and has powers granted it by the State Legislature. *N.Y. Constitution*, Art. XI § 2. The Regents, all of whom are elected by the State Legislature, function as the legislature for higher education because they were granted those powers by the State Legislature. *Moore v. Bd. Regents University of the State of New York*, 44 N.Y.2d 593, 600 (1978); N.Y. Educ. Law § 207; (Compl. ¶21).

The Regents' Statewide Plans and policy statements are in effect laws, rules, and regulations governing higher education. *See* N.Y. Educ. Law § 207.

> [A] critical function of the Regents is its preparation … of a master [statewide] plan "for the development and expansion of higher education" in New York. N.Y. Educ. Law § 237(1). This plan includes public as well as private institutions.

*Moore*, 44 N.Y.2d at 598. The Regents' Statewide Plans are required to "[i]dentify[] the resources needed to achieve the [plans'] goals." N.Y. Educ. Law § 237(1)(d)(3)(Compl. ¶ 26). The Regents also periodically issue policy statements to supplement or set the direction that

higher educational institutions should take in their programs.  NYSED website, http://www.highered. nysed.gov/ocue/lrp/; *see* N.Y. Educ. Law § 207; (Compl. ¶ 27).

The State Legislature annually appropriates specific sums to USNY that the legislative mandate of N.Y. Educ. Law § 237 requires be spent, in part, on the formulation and execution of Regent Statewide Plans and policy statements, such as the major policy statement *Equity for Women-Action Plan*.  The master plans and policy statements are also mandated by N.Y. Educ. Law § 237(1)(d)(3) to list resources for the execution of USNY's plans and policies, including *Equity for Women-Action Plan*.  Such resources are provided out of the specific appropriations for USNY.[7]  SED serves as the Regents administrative arm expending the designated resources to carry out USNY's policies, which includes its *Equity for Women-Action Plan* that promotes Feminism in higher education.

Government, whether state or federal, "may not favor one religion over another, or religion over irreligion ...," *McCreary County v. ACLU*, 545 U.S. 844, 875 (2005), and may not promote or affiliate itself with any religious doctrine or organization, *County of Allegheny v. ACLU*, 492 U.S. 573, 590 (1989).  Whether the keyword is "promotion," "affiliation," or "favoritism," the essential principle remains the same, the Establishment Clause prohibits government from appearing to take a position on questions of religious belief, *County of Allegheny*, 492 U.S. at 593-594; it may not take sides and must remain neutral, *McCreary*, 545 U.S. at 860 (citations omitted).

To avoid taking sides, government laws and activities must have (1) a secular purpose, (2) their primary effect must not advance religion, and (3) they must not excessively entangle the

---

[7] From a different perspective, the Regents act as the legislature for higher education.  N.Y. Educ. Law § 207. Funds from State taxpayers are provided to USNY by the State Legislature.  The Regents, acting as a legislature, specifically appropriate some of those funds for the implementation of its policy *Equity for Women-Action Plan* and its Feminist tenets and SED expends those funds to enforce that policy at Columbia and IRWG.

government with religion.  *Cooper*, 577 F.3d at 494 (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971)).

*Lemon's* "purpose" requirement aims at preventing government from abandoning neutrality and acting with the intent of promoting a particular point of view in religious matters. *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 335 (1987).

In 1972, the State embarked on a secular purpose of balancing the number of males and females benefiting from higher education.  *Regents Statewide Plan 1972*, p. 103 (DH Decl. Ex. K); *Equal Opportunity for Women-A Statement of Policy and Proposed Action*, Position Paper No. 14, p. 6 (1972) (DH Decl. Ex. J)(Compl. ¶¶ 55, 94, 95).  In 1972, females made up 42% of all college students.  *Bureau of the Census*.  By 1984, however, more females than males were attending and graduating from New York colleges and universities, yet the State continued its policy of increasing the number of females and the opportunities available to them.  *Regents Statewide Plan 1984* (DH Decl. Ex. L); *Regents Major Policy Statement for 1984* (DH Decl. Ex. M)(Compl. ¶¶ 92, 93, 96, 97).  The State's purpose was no longer secular affirmative-action because the results had gone far beyond equal treatment by the State's own measures.  *See Johnson v. Transportation Agency*, 480 U.S. 616, 632, 637 (1987)(the purpose of affirmative-action is to eliminate the effects of past discrimination and obtain equitable representation).

In 1988, the State called for the increased participation of females in underrepresented fields, such as mathematics and science, even though it would further decrease the number of males receiving college degrees.  *Regents Statewide Plan for 1988* (DH Decl. N)(Compl. ¶ 98).

Then in 1993, when over 55% of college students were female, and females earned 60% of the associate degrees, 54% of the bachelor degrees, and 58% of the master's degrees, the State

made clear its changed purpose in the major policy statement:  *Equity for Women in the 1990s,*

*Regents Policy and Action Plan*, *Background Paper*, DH Decl. Ex. H, Compl. ¶ 99.  This policy,

still in effect today, openly promotes, favors, and affiliates the State with a particular point of

view for governing higher education—Feminism.  (Compl. ¶¶ 99-106).  The Complaint at ¶¶

100-106 lists some of the governing requirements of that policy which enforces Feminist

objectives not just in Women's Studies programs but throughout higher education and its

interactions with business and cultural institutions.  *Equity for Women-Action Plan* pp. v, 1, 6;

(Compl. ¶¶101-103).  Among those requirements is exclusively favoring opportunities for

females even when females far outpace males.

   While it is always difficult to determine "intent" or the government's "purpose," when a

government consistently over a 27 year period enforces policies favorable to the already

preferentially treated majority at the expense of the minority, the only objective conclusion is

that a particular belief system, which exalts the majority over the minority, is at work.  In

America in this day and age, that belief system is Feminism.[8]  (Compl. ¶¶ 111-115).

   In the end, the State's secular purpose of 1972 was replaced with a Feminist purpose, and

USDOE, by delegating its college accrediting responsibilities to the State, 8 N.Y.C.R.R. § 4-1.1,

and providing funding to the Regents and SED that supports turning higher education into a

Feminist construct, knowingly facilitated the State's advancing of Feminism.  (Compl. ¶¶ 42,

43).  The power and authority of government has impermissibly been put on the side of one

particular sort of believers—Feminists, *see Torasco v. Watkins*, 367 U.S. 488, 490 (1961), which

---

[8] Today, females make up 58% of all the State's college students, receive over 55% of the Bachelor degrees, over 63% of the Master's degrees, and over a majority of the Doctoral degrees.  SED, *ORIS*.  By 2016, across America, females will receive 64% of the Associate degrees, over 60% of the Bachelor degrees, 53% of the Professional degrees, and 66% of the Doctoral degrees.  National Center for Educational Statistics, *Digest of Educational Statistics*, Table 258.

effectively favors their beliefs over that of others, *see Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415, 430 (2d cir. 2002).

As far as "entanglement," the *Equity for Women-Action Plan* requires the State to monitor all higher educational institutions, including Columbia, to assure the policy's implementation:

- SED assigned the "responsibility to monitor progress toward the stated goals," *Equity for Women-Action Plan* p. 11, DH Decl. Ex. H; Compl. ¶ 106;

- SED staff to re-train faculty as to appropriate sex roles and provide "regular monitoring and reinforcement [of that view] in educational settings," *Equity for Women-Action Plan* p. 6, DH Decl. Ex. H; Compl. ¶ 105(d);

- SED staff to conduct "academic program reviews at colleges and universities" in order to determine whether gender specific patterns have disappeared, *Equity for Women-Action Plan* p. 7, DH Decl. Ex. H; Compl. ¶ 105(e);

- "Practices that support, recruit, and promote women will be identified and replicated" while all others will be "eliminated," as determined by SED's Affirmative Action Officer, *Equity for Women-Action Plan* p. 9, DH Decl. Ex. H; Compl. ¶ 105(g).

Such monitoring by public authorities excessively entangles the State with implementing Feminist tenets at Columbia and IRWG. *Lemon*, 403 U.S. at 627 (the Supreme Court found excessive entanglement from a state subsidy for religious school teachers because to assure the teachers taught only secular matters would require a monitoring program that would be just a little short of ongoing surveillance). The *Equity for Women-Action Plan* extensive monitoring also creates an impermissible joint exercise of religious and civic authority that advances Feminism through college and State affirmative action officers. *See Commack*, 294 F.3d at 430.

The allegations of the State's lack of neutrality and extensive involvement in enforcing its Feminist action plan at Columbia and IRWG is not based on some set of undisclosed facts but the State's own admissions in its Statewide Plans and policy statements. In addition, its purpose

cannot be to make up for a lack of New York laws that prohibit sex discrimination in colleges and universities.  *See* N.Y. Civil Rights Law § 40-c and N.Y. Exec. Law § 291(2).

The establishment clause prohibits such government endorsement of religious activities because "endorsement sends a message to nonadherents that they … are outsiders of the political community, and … to adherents that they are insiders, favored members of the political community."  *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984)(O'Connor, J. concurring).  In New York's colleges and universities, thanks to the State's policies, the insiders are adherents of Feminism.

C.  The State and the U.S. Department of Education's institutional financing of Columbia's IRWG have the effect of advancing the religion Feminism.

"The prohibition on establishment [also] covers ... financial aid for religious individuals and institutions…."  *McCreary*, 545 U.S. at 875.  Public funding may not be provided to an institution "in which religion is so pervasive that a substantial portion of its functions are subsumed in the religious mission or when it funds a specifically religious activity in an otherwise substantially secular setting."  *Bowen*, 487 U.S. at 610 (quoting *Hunt v. McNair*, 413 U.S. 734, 743 (1973)).  "The general prohibition on funding pervasively sectarian institutions is essentially a prophylactic rule, designed to prevent the 'risk' that the government's money, though designated for a specific secular purpose, 'may nonetheless advance the pervasively sectarian institution's 'religious mission.'"  *Lamont*, 948 F.2d at 842 (2d Cir. 1991)(internal quotes, *Bowen*, 487 U.S. at 610).

By IRWG's own admission, it "is the locus of interdisciplinary feminist scholarship and teaching," which "focus[es] on women, gender, and/or feminist ... perspectives," and offers "an undergraduate degree program in Women's and Gender Studies, and graduate certification in Feminist Scholarship ...."  (DH Decl. Ex. I; Complaint ¶¶ 120, 124, 143).  IRWG propagates the

modern-day religion of Feminism through lectures, seminars, consciousness indoctrination sessions, publications, career preparations, counseling, historical revisionism, propagandizing, inculcating unanimity of thought, promoting a pantheon of idols such as Mary Wollstonecraft, cultivating *de facto* apostles and disciples, and three public lecture series.  (Compl. ¶ 53).  IRWG administrators and teachers indoctrinate Feminism by supporting and instructing persons in a body of Feminist doctrine or principles, by initiating persons through Feminist doctrinal instruction, by imbuing persons with a Feminist partisan point of view, and by inculcating Feminism.  *Cf. DeStefano*, 247 F.3d at 416-417; (Compl. ¶ 150-152).  IRWG has a catalogue of Feminist activities that permeate it, and whatever secular teaching at IRWG may exist cannot be separate from the admitted Feminist mission of the institute.  (DH Decl. Ex. I; Complaint ¶¶ 121-124).

Although the study of religion, when presented objectively as part of a secular program of education, will not violate the Establishment Clause, *Abington School Dist. v. Schempp*, 374 U.S. 203, 225 (1963), as IRWG's website admits, its purpose is to propagate Feminism through instruction, training, advocacy, indoctrination, and proselytizing.  (Complaint ¶¶ 125-142).

The Complaint alleges on "information and belief" that funds from the State and USDOE, which are <u>not</u> student aid, go directly into supporting the operation of IRWG and, therefore, into furthering Feminism.  (Complaint ¶¶ 40, 148, 151, 153, 156, 157, 161).  Such aid includes State Bundy funds and USDOE awards, contracts, and research grants.  (Compl. ¶¶32, 40, 148).  It does not matter that the aid maybe channeled through Columbia's controller to IRWG.  *See Lamont*, 948 F.2d at 828 (even though federal grants provided to sectarian schools were channeled through intermediaries, it still constituted aiding religion).

The flow of State funds to IRWG are required to be reported to SED.  *Bundy Participant Reporting Requirements* ¶¶ 3, 4, http://www.highered.nysed.gov/oris/bundy/.  SED, however, denied a Freedom of Information Law request regarding direct financial aid provided Columbia on the grounds that "SED does not possess or maintain" such records.  (DH Decl. Ex G).  HESC, however, stated that SED "is the New York Agency that maintains records of the amounts of government-based financial assistance received by individual schools in New York State on an annual basis."  (DH Decl. Ex. G).  Since these are motions on the pleadings, the allegations of State funding to IRWG should be accepted as true under the plausibility standard because the information is peculiarly within the knowledge of SED, which refused to release it.  *Arista Records LLC*, 604 F.3d at 120 (2d Cir. 2010); *Boykin v. KeyCorp*, 521 F.3d 202, 215 (2d Cir. 2008).  The flow of State, as well as USDOE, institutional funds are also contained in Columbia's managerial accounting statements, but Columbia has refused to provide such information to the Class Representative.  (DH Decl. Ex. G).

The purpose of  the State's "Bundy" aid, N.Y. Educ. Law § 6401, is to "provide[] direct unrestricted financial support to certain independent postsecondary institutions" in order to help "preserve the strength and vitality of [New York's] private and independent institutions of higher education…."  http://www.highered.nysed.gov/oris/bundy/ (Overview).  It is <u>not</u>, as the State argues, to help students finance their education.  (State Memo. pp. 20-22).

Before IRWG receives any Bundy aid, its Women's Studies Program has to be approved by the State, N.Y. Educ. Law § 6401(2)(iii), which means reviewing the subject matter of courses and other aspects of the program, 8 N.Y.C.R.R. §§ 50.1(i), 52.1(b)(3), 52.2, 126.1(d); *supra* "Facts."  In addition, "[i]nstitutions must make application to participate and must meet the eligibility criteria set forth in Section 6401 of the Education Law."  http://www.highered.

nysed.gov/oris/bundy/ (Overview).

Bundy aid differs from student aid in that it is the institution making choices as to whether to apply for such funds—not the students.  The Supreme Court requires full free private choices by students—not institutions—in order to avoid violating the neutrality requirement of the Establishment Clause.  *E.g. Mueller v. Allen*, 463 U.S. 388 (1983)(student tax deductions for educational expenses); *Witters v. Wash. Dept. of Servs. For Blind*, 474 U.S. 481 (1986) (scholarship program); *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1 (1993)(funds for private sign language interpreters for deaf students); *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002)(tuition and tutorial aid for students).

> [T]he distinction between a per-capita school-aid program [Bundy aid] and a true private-choice program is significant for purposes of endorsement.  *See*, *e.g.*, *Lynch v. Donnelly*, 465 U.S. 668, 692 (1984)(O'CONNOR, J., concurring).  In terms of public perception, a government program of direct aid to religious schools based on the number of students attending each school differs meaningfully from the government distributing aid directly to individual students who, in turn, decide to use the aid at the same religious schools.

*Mitchell v. Helms*, 530 U.S. 793, 842-843 (2000)(plurality decision)(O'Connor, J., concurring in judgment).

Bundy aid to IRWG is also similar to the aid provided sectarian schools in two Supreme Court cases that found violations of the Establishment Clause.  In *Levitt v. Comm. for Public Educ.*, 413 U.S. 472 (1973), an unrestricted lump sum per student was required by the State to be paid to private schools for internal testing, and in *Comm. for Public Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756 (1973), grants were paid to private schools for maintenance and repair based on the number of pupils in the school.  While in *Levitt* and *Nyquist*, students could choose where they attended school, the Court in *Zelman* did not rule that such gave students a full free

choice of where the government funds went.  If it had, then *Levitt* and *Nyquist* would have been overruled and they were not.

USDOE's alleged providing of non-student aid in the form of awards, contracts, and research grants to IRWG, Complaint ¶¶40, 148, which are in no way dependent on student choices to attend IRWG, is similar to the situation in *Tilton v. Richardson*, 403 U.S. 672 (1971), where grants under the Federal Higher Education Facilities Act violated the Establishment Clause when the government could no longer assure the financed facilities were used for non-sectarian activities.

State and USDOE institutional aid to Columbia for the benefit of the sectarian institution IRWG advances the religion Feminism propagated at IRWG.

## CONCLUSION

The purpose of the State's higher education policies, enforced with State and federal taxpayer dollars, is to induce others to read, meditate upon, venerate, and obey Feminist tenets. However desirable that might be as a matter of private devotion, it is not a permissible government objective under the Establishment Clause.

The State and USDOE's institutional funding of IRWG endorses and supports that institution's inculcation of Feminism in violation of the Establishments Clause.

The defendants' motions to dismiss should be denied.


Dated: New York, New York
        March 8, 2011

                                            /S/
                                            _____
                                            Roy Den Hollander, Esq. (1957)
                                            Attorney and Class Representative
                                            545 East 14 Street, 10D
                                            New York, N.Y. 10009
                                            (917) 687-0652