UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------x

Roy Den Hollander,

              Plaintiff on behalf of himself and all others
              similarly situated,


                  -against-

Members of the Board of Regents of the University of the State of
      New York, in their official and individual capacities;
Chancellor of the Board of Regents, Merryl H. Tisch, in her official
      and individual capacity;
New York State Commissioner of the Department of Education,
      David M. Steiner, in his official and individual capacity;
Acting President of the New York State Higher Education Services
      Corp., Elsa Magee, in her official and individual capacity;
U.S. Department of Education; and
U.S. Secretary of Education, Arne Duncan, in his official capacity;

              Defendants.
--------------------------------------------------------------------------------x

Docket No.
10 CV 9277
(LTS)(ECF)

**ESTABLISHMENT
CLAUSE
COMPLAINT
Jury Demanded**

## I.  Introduction

1.  This putative class action seeks declaratory and injunctive relief against the New York

State defendants, pursuant to the 14th Amendment and 42 U.S.C. § 1983, and the U.S. defendants

for their ongoing violation of the Establishment Clause of the First Amendment to the U.S.

Constitution by aiding the modern-day religion Feminism at Columbia University ("Columbia")

and its Institute for Research on Women and Gender Studies ("IRWG").

2.  The Chancellor and Members of New York State's Board of Regents ("Regents") and the

Commissioner and the New York State Department of Education ("SED") require higher

education institutions, such as Columbia and IRWG, to adhere to the doctrine of Feminism.

3.  The Regents, SED, and the Acting President and New York State's Higher Education

Services Corporation ("HESC") expend public funds, which are appropriated by the New York

State Legislature and mandated for higher education, in support of the inculcation of Feminism by Columbia's IRWG and IRWG's Women's Studies program.

4.  The Secretary and the U.S. Department of Education ("USDOE") expend public funds, which are appropriated by the U.S. Congress and mandated for higher education, in support of the inculcation of Feminism by Columbia's IRWG and IRWG's Women's Studies program.

5.  IRWG's avowed purpose is to bring the doctrine of Feminism to its students and the members of the Columbia Community.

6.  The putative class is represented by Roy Den Hollander who is a New York State and U.S. taxpayer and alumnus of Columbia University's Business School.

7.  Den Hollander uses the facilities and services he is entitled to as an alumnus of Columbia and is directly affected by the New York State defendants requiring Columbia to comply with Feminist precepts and by the State defendants and USDOE using tax dollars to financially support the propagation of the Feminist doctrine at IRWG.

8.  The Establishment Clause was intended to apply to any religious activity or institution, whatever it may be called, or whatever form it may adopt to teach or practice religion.

9.  It is a truism that purely domestic funding programs are subject to constitutional limitations and to judicial scrutiny while Establishment Clause challenges simply require the application of well-established Establishment Clause standards—a task traditionally vested in the federal courts.

## II.  Jurisdiction and Venue

10.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action raises federal questions under the First and 14th Amendments to the U.S. Constitution.

11.  This Court has personal jurisdiction over the defendants in accordance with Fed. R. Civ. P. 4(e)(2)(C), 4(i)(2), 4(j)(2)(B) and New York C.P.L.R. § 307(1) & (2)(2).

12. This Court has venue under 28 U.S.C. 1391(b)(2), (e)(2) & (3).

### III.  Parties

13.  The Class Representative plaintiff is a resident of New York County, N.Y., a citizen of the United States, a New York State and federal taxpayer, a member of the Columbia Community as an alumnus of the Columbia University Business School, and an attorney admitted to practice before this Court.

14.  The putative plaintiff class consists of all Columbia alumni, students, and employees who are New York State and federal taxpayers that find the inculcation and manifestations of Feminism at Columbia offensive.

15.  There are questions of law and fact presented in this action that are common to the entire class and that affect the rights of the class.

16.  This class action is maintainable under Fed. R. Civ. P. § 23(b)(2) because the defendants have acted on grounds generally applicable to the class, thereby making declaratory and injunctive relief appropriate to the class as a whole.

17.  The exact number of members of the class is not known, but it is estimated to be too large for joinder of all members to be practical.

18.  The Regents defendants are responsible within New York State for the supervision of educational activities, chartering and controlling higher educational institutions, and presiding over the University of the State of New York and New York's Department of Education, which contains within it the Higher Education Services Corporation that has its own Board of Trustees.

N.Y. Educ. Law §§ 101, 207, 214, 215, 216, 219, 226(4), & 652; NYSED/Board of Regents, http://www.regents.nysed.gov/.

19. The University of the State of New York is America's most comprehensive and unified educational system, which encompasses all the institutions, both public and private, offering education in the State. NYSED/Board of Regents, http://www.regents.nysed.gov/.

20. The University of the State of New York's mission is to provide educational programs and related services to the residents of the State. N.Y. Educ. Law § 201.

21. The Regents exercise legislative functions concerning the higher educational system in New York State, determine higher education policies, and establish the rules for carrying those policies into effect throughout the higher educational institutions of the State. N.Y. Educ. Law § 207.

22. Columbia and IRWG are part of the University of the State of New York.

23. Through the Regents power to suspend the charters of higher educational institutions, N.Y. Educ. Law §§ 210 & 215, and its power to register degree granting educational programs and curricula, Regents Rule § 13.1, which includes courses and all of a school's facilities, 8 N.Y.C.R.R. §§ 3.47(a), 50.1(i), 52.1, 52.2, 126.1(d), the Regents control what is taught in colleges and universities in the State, the environment in which it is taught, and limit which educational programs receive accreditation, and, therefore, State and federal funding.

24. Every four years the Regents develop or update their master plan for higher education in New York called the Statewide Plan for Higher Education and review the plan's implementation by higher educational institutions. N.Y. Educ. Law § 237.

25. In formulating their plans, the Regents take into consideration the master plan of the Commission on Independent Colleges and Universities of New York, which is a non-

governmental body chartered by the Regents and representing the policy interests of New York's

private colleges, such as Columbia, which, on information and belief, have and continue to

advocate the institutionalization of Feminism in higher education.

26.  The Regents' Statewide Plans, under N.Y. Educ. Law § 237:

a.  define the missions and objectives of higher education;
b.  set goals, describe the time for meeting those goals, identify the resources needed, and establish priorities; and
c.  evaluate the effectiveness of educational programs.

27.  The Regents also periodically issue policy statements to supplement or set the direction

that higher educational institutions should take in their programs.  NYSED website,

http://www.highered.nysed.gov/ocue/lrp/; *see* N.Y. Educ. Law § 207.

28.  The Regents preside over SED, which functions as the Regents' administrative arm in

carrying out the Regents' mandates, policies, and plans.  N.Y. Educ. Law § 101.

29.  The Regents must approve or authorize all SED's regulations for effecting the Regents'

mandates, policies, and plans.  N.Y. Educ. Law § 207.

30.  SED evaluates and monitors higher educational programs in New York colleges and

universities, such as IRWG's Women's Studies program, in order to assure the programs are

consistent with the Statewide Plan and Policy Statements formulated by the Regents.  8

N.Y.C.R.R. § 52.1(c).

31.  On behalf of the Regents, SED administers State and federal grants and scholarships in

higher education.  NYSED website, http://www.highered.nysed.gov/ocue/he/structureofhe.html.

32.  SED provides direct financial aid to colleges and universities under N.Y. Education Law

§ 6401, known as "Bundy Aid," which is paid based on the number of degrees awarded by a

higher educational institution in order to support the operation of that institution.  It is a

"program of direct State aid to qualifying" institutions of higher education.  McKinney's 1968

Session Laws, *Gov. Rockefeller Statement* p. 2380.

33.  "No portion" of "Bundy Aid" can "be used for the religious instruction … or for the

advancement or inhibition of religion."  8 N.Y.C.R.R. § 150.2; *see also* N.Y. Educ. Law §

6401(2)(a)(iv).

34.  HESC administers the State's financial aid and loan programs and supports the

administration of federal student aid programs in New York.  N.Y. Educ. Law § 652(2).

35.  HESC provides loan guarantees, grants, and scholarships, N.Y. Educ. Law § 655, much

of it paid directly to colleges and universities, such as Columbia, 8 N.Y.C.R.R. § 2206.1, that

enable students to fund their education at colleges and universities within the State.

36.  HESC requires that any financial aid is limited to students attending a program approved

by SED.  N.Y. Educ. Law §§ 604 & 605-a.

37.  Financial aid provided or guaranteed by HESC is made based on information given by

both the student and the institution of attendance.  8 N.Y.C.R.R. § 2205.1.

38.  USDOE establishes policies for federal financial aid to education in order to assist

institutions of higher learning.  20 U.S.C. § 1070(a)(5).

39.  USDOE regulates the operation of all parties involved in the financing process,

distributes and monitors federal funds, and enforces equal access to education.  USDOE website,

http://www2.ed.gov/about/what-we-do.html.

40.  On information and belief, USDOE provides awards, contracts, and research grants to

higher educational institutions.

41.  USDOE distributes student federal grants and direct loans of federal funds that are paid

directly, 34 C.F.R. 668.164, to colleges in order to finance the education of students attending

colleges and universities in the State.  20 U.S.C. § 1070a, 20 U.S.C. § 1070a-1, 20 U.S.C. §

1070b, 20 U.S.C. § 1071, 20 U.S.C. § 1087aa.

42.  USDOE delegated to the Regents and SED the responsibility for determining which

higher educational institutions in New York State are eligible for federal student aid programs.  8

N.Y.C.R.R. § 4-1.1.  In effect, the Regents and SED act as USDOE's agents for accrediting

colleges and universities for participation in federal student aid programs and programs

providing institutions federal awards, contracts, and research grants.

43.  On information and belief, USDOE also provides funding to the Regents and SED that

supports their turning higher education into a Feminist construct.

### IV.  Feminism as a Religion

44.  A belief system need not be theistic in nature to be a religion but rather can stem from

moral or ethical tenets that are held with the strength of traditional religious convictions.

45.  The U.S. Supreme Court has rejected the view that religion is defined solely in terms of

a Supreme Being by noting that "Buddhism, Taoism, Ethical Culture, Secular Humanism," and

other non-theistic belief-systems are religions.

46.  The Equal Employment Opportunity Act, 42 U.S.C. § 2000e(j), defines the term

"religion" as including "all aspects of religious observance and practice, as well as belief."

47.  Title VII of the Civil Rights Act of 1964 definition of religion under 29 C.F.R. § 1605.1

"define[s] religious practices to include moral or ethical beliefs as to what is right and wrong

which are sincerely held with the strength of traditional religious views."

48.  Religious beliefs are generally characterized by, among other traits, ultimate ideas;

metaphysical beliefs; moral or ethical system; shared and comprehensive doctrine; and the

accoutrements of religion, such as founders, prophets, teachers, important writings, keepers of

knowledge, structure or organization, holidays, and proselytizing.

49.  Five U.S. Courts of Appeals and the U.S. Southern District Court for New York have

used the following criteria to determine whether a belief system is a religion for purposes of the

Establishment Clause:  (a) most importantly is the nature of the ideas, do they address

fundamental and ultimate questions having to do with deep and imponderable matters (a court

must, at least to a degree, examine the content of the supposed religion to determine whether the

subject matter it comprehends is consistent with the assertion that it is, or is not, a religion); (b)

do the ideas have a broader scope that lay claim to definitive and comprehensive truths; (c) least

important, does the belief system have formal and external signs such as structure, organization,

efforts at propagation, and observance of holidays similar to traditional religions.

50.  The Feminist doctrine advanced and aided by the defendants at Columbia University and

IRWG:

   a. Provides followers with a faith-based certainty that they are the sole possessors of the
      highest form of truth to the answers of life's persistent questions even though those truths
      cannot be proven empirically.
   b. Shapes the entirety of its followers' lives with thought patterns that make possible the
      description of realities, the formulation of beliefs, and the experiencing of inner attitudes,
      feelings, and sentiments.
   c. Provides a conscious push toward an ultimacy and transcendence that provide norms and
      power throughout life.
   d. Indoctrinates theories as to the place in the order of nature for males and females.
   e. Propagates basic attitudes to the fundamental problems of life.
   f. Provides answers on how to deal with certain situations that arise throughout life.
   g. Defines the fundamental concerns for humans in modern day society.
   h. Proselytizes moral codes of right and wrong.
   i. Inculcates comprehensive beliefs on matters ranging from the insignificant through the
      ordinary to the material which are accepted as true, such as the difference between right
      and wrong, good and evil, how to live one's life and die one's death.
   j. Advocates a theory of humanity as believed it should be, purged of the evil elements
      which retard its progress toward the knowledge, love, and practice of the right.
   k. Organizes beliefs into a holistic system of a Feminist world view with tenets for
      comprehension and commandments for conduct.

l.   Mandates a lifestyle that requires a broad system for conduct in all spheres of existence, including appropriate acts of volition; correct thinking; and acceptable language, such as "issues" for "problems," and "gender" for "sex" (unless it involves accusations of "sexual abuse").

m.  Advocates beliefs that are based upon a faith to which all else is subordinate and which all else is ultimately dependent.

n.   Is shared by an organized group.

o.   Combines Feminist research on various topics into a comprehensive belief system.

p.   Validates the spirit of its followers with importance, meaning, purpose, and security.

q.   Inculcates beliefs based on the teachings of certain prophet-like individuals, such as Mary Wollstonecraft.

51.  The core of Columbia's Feminist apple is IRWG with 75 teachers of which only four are male.

52.  Under Columbia University Statutes §§ 350 and 351, IRWG is an institute within Columbia University that conforms to the policies of appropriate faculty bodies as designated by the University President.  Institutes have budgets for research expenses, clerical and technician help and receive allocations from departmental budgets for other research expenses or salaries. The direction of each institute is assigned to a coordinating committee or an administrative committee of the University.

53.  IRWG exists to specifically bring Feminism to the Columbia Community:

a.   IRWG is a well-organized institution with its own budget, mission, goals, and structure that places the director on top, followed by administrative officers, instructors, and lastly the budding followers.

b.   IRWG's administrators and teachers preserve and teach Feminist precepts.

c.   IRWG, as it admits, propagates Feminism through its Women's Studies program with lectures, seminars, consciousness indoctrination sessions, publications, career preparations, counseling, historical revisionism, propagandizing, and unanimity of thought labeled "politically correct."

d.   IRWG's website states it "is the locus of interdisciplinary feminist scholarship and [feminist] teaching at Columbia University" and "[t]he [Women's Studies] program is intended to introduce students to the long arc of feminist discourse about the cultural and historical representation of nature, power, and the social construction of difference.  It encourages them to engage the debates regarding the ethical and political issues of equality and justice that emerge in such discussions.  And it links the questions of gender and sexuality to those of racial, ethnic, and other kinds of hierarchical difference."

e.  IRWG exalts certain Feminists to apostle-like status and celebrates certain days of the
year as important to Feminism.

54.  In the Feminism inculcated at Columbia and IRWG, scientific differences between the
sexes are replaced with the faith-based premise that such differences are socially constructed;
that is, they result from social programming.

55.  The Regents began promoting this doctrine before the creation of IRWG by declaring
that "[b]oys and girls learn very early in life from their toys, their games, what they see on TV,
and the way adults treat them to conform to what is considered typical of their sex," which is
reinforced by education.  *Equal Opportunity for Women-A Statement of Policy and Proposed
Action,* Position Paper No. 14, p. 6 (1972).

56.  Such a disregard for neuroscience, evolution, biology, and physics makes the belief
incomprehensible and incorrect—a characteristic of religion, but essential for the Regents and
SED to justify the continuing imposition of Feminism as the dominant belief system in the
State's higher education.

57.  Feminism and the Regents' policies avoid the scientific method in that their precepts are
not the result of knowledge gained by testing hypotheses to develop understanding through the
elucidation of facts or evaluation by experiments.

58.  Unlike scientific knowledge, Feminism and the Regents' Feminist policies ignore later
refinement in the face of new information.  The Regents, as did the Catholic Church in the
Middle Ages, decide which scientific evidence is acceptable and which unacceptable depending
on whether it supports Feminist doctrine.

59.  For example, the Regents claim that females "do not get the same economic return on
their education as men."  *Equity for Women in the 1990s, Regents Policy and Action Plan,*

*Background Paper* (1993)(the document contains two papers separately cited as *Equity for Women-Action Plan* or *Equity for Women-Background Paper*).

60.  Females, however, earn more per unit of time worked than males.  The average man spends 44% more time working or doing work related activities than the average woman, U.S. Department of Labor, Bureau of Labor Statistics, *Time Use Survey 2007*, Table A-1, while the average woman makes 77% that of the average man.  If the two were paid equally for their time actually worked, then the pay for the average woman should be 69.5% that of the average man—not 77%.

61.  Feminism and the Regents' policies claim as unfair that "[t]he percentage of women in leadership positions … continues to reflect a lack of access" to the "Glass Ceiling."  *Equity for Women-Action Plan* p. 2.

62.  Feminism and the Regents' policies, however, fail to note the countervailing fact that the 25 most dangerous occupations in America are 90% occupied by men; males are 20 times more likely to be killed or injured on the job; and over all occupations, men suffer 92% of the job related deaths while making up 50% of the work force.  U.S. Department of Labor, Bureau of Labor Statistics, Current Population Survey, *Employment and Fatalities by Gender of Worker* (2006).  It's called the "Tombstone Basement."

63.  Since men bear greater risks and burdens, then fairness requires them to enjoy more of the benefits, but the Regents and Feminism ignore this logical principle in order to propagate Feminist precepts.

64.  Feminism and the Regents' policies claim that "[w]hen women and men have comparable education and experience, men are often paid more."  *Equity for Women-Action Plan* pp. 2-3.

65.  Once again, this Feminist belief on which New York's higher education has been partly modeled is merely dogma lacking in empirical data.  Never married, college educated males who work full-time make only 85% of what comparable females earn.  John Leo, *Of Men, Women, and Money*, (contributing editor U.S. News & World Report, citing Dr. Warren Farrell, *Why Men Earn More*).  In 1960 it was 94%.  *1960 U.S. Census of Population*.

66.  Feminism and the Regents' policies foist the belief that "[w]omen in mid-life see a greater disparity in their earning."  *Equity for Women-Action Plan* p. 3.

67.  Data from the *National Longitudinal Survey*, however, reveal that females between the ages of 18 and 34 have been out of the labor force 27 percent of the time, in contrast to 11 percent for men, and females ages 45 to 54 who have recently re-entered the workforce after a five or 10-year break are competing against men who have had 20 years of continuous experience.  Denise Venable, *Wage Gap Myth*.

68.  Feminism and the Regents' policies assert that female faculty have "mean salaries lower than their male counterparts," *Equity for Women-Action Plan* p. 4, while ignoring that among professors who produce an equal number of journal articles, men are likely to be paid the same or just slightly less than females.  Dr. Warren Farrell, *Why Men Earn More*.

69.  These are just some of the Feminist beliefs adopted by the Regents as reasons for injecting Feminism into their higher education policies and requiring colleges and universities to operate in accordance with the Feminist creed.

## V.  Standing

70.  Where the asserted basis for subject matter jurisdiction is also an element of the plaintiffs' allegedly federal cause of action, the Second Circuit asks only whether—on its face—

the complaint is drawn so as to seek recovery under the Constitution, and if so, then it assumes or finds a sufficient basis for jurisdiction, and reserves further scrutiny for an inquiry on the merits.

71.  So whether Feminism is a religion is not a standing issue, since that goes to the merits.

***Taxpayer Standing***

72.  History reveals that the Establishment Clause was intended to protect both against the kind of governmental encroachment that might lead to the establishment of a national religion and against the taxation of citizens in order to support religion.

73.  One of the injuries asserted in this action is the use of the plaintiff class taxpayers' New York State and U.S. tax dollars for expenditures that violate the Establishment Clause.

74.  The plaintiff class challenges the constitutionality of expenditures that benefit IRWG, which are made by the Regents, SED, and HESC pursuant to statutory mandate under the following New York statutes that authorize specific appropriations and disbursements of New York taxpayer dollars to higher education.  These are not general appropriations for day-to-day governmental operations:

> N.Y. Education Law § 6401 ("Bundy Aid"), the State pays money directly to Columbia for each degree awarded by IRWG in Women's Studies, which benefits IRWG;
>
> N.Y. Education Law § 667 ("TAP"), 8 N.Y.C.R.R. § 2206.1, the State pays directly to Columbia funds for tuition assistance awards for students in Women's Studies, which benefits IRWG;
>
> N.Y. Education Law § 667-c ("APTS"), 8 N.Y.C.R.R. § 2206.1, the State pays directly to Columbia funds for tuition awards for part-time students in Women's Studies, which benefits IRWG; and
>
> N.Y. Education Law § 669-a, 8 N.Y.C.R.R. § 2206.1, the State pays directly to Columbia funds for tuition awards for veterans in Women's Studies, which benefits IRWG.

75.  The plaintiff class challenges the constitutionality of expenditures that benefit IRWG, which are made by USDOE pursuant to statutory mandate under the following statutes passed by

Congress that authorize specific appropriations of federal taxpayer dollars to higher education.

These are <u>not</u> general appropriations for day-to-day governmental operations:

> 20 U.S.C. § 1070a(b)(8) & (g), Congress appropriates funds for Federal Pell Grants that are paid directly to Columbia, 34 C.F.R. 668.164; USDOE, *Guide to Federal Student Aid* p. 13 (2010-11), for students in Women's Studies, which benefit IRWG;

> 20 U.S.C. § 1070a-1, Congress appropriates Academic Competitiveness Grants that are paid directly to Columbia, 34 C.F.R. 668.164; USDOE, *Guide to Federal Student Aid* p. 15 (2010-11), for students in Women's Studies, which benefit IRWG;

> 20 U.S.C. § 1070b(b), Congress appropriates funds for Federal Supplemental Educational Opportunity Grants that are paid directly to Columbia, 34 C.F.R. 668.164; USDOE, *Guide to Federal Student Aid* p. 13 (2010-11), for students in Women's Studies, which benefit IRWG;

> 20 U.S.C. § 1071(b), Congress appropriates funds for the Stafford Student Loan and Plus Loan Programs that are paid directly to Columbia, 34 C.F.R. 668.164; USDOE, *Guide to Federal Student Aid* pp. 19, 21 (2010-11), for students in Women's Studies, which benefit IRWG;

> 20 U.S.C. § 1087aa(b) & (c), Congress appropriates funds for the Federal Perkins Loan Program that are paid directly to Columbia, 34 C.F.R. 668.164; USDOE, *Guide to Federal Student Aid* p. 18 (2010-11), for students in Women's Studies, which benefit IRWG; and

> On information and belief, Congress appropriates funds used for various awards, contracts, and research grants that are dispensed by USDOE to IRWG or Columbia for the benefit of IRWG.

76.  These State and U.S. statutes are not challenged on their face but that the funds authorized by the New York Legislature and Congress are being disbursed in a manner that benefit IRWG, a pervasively sectarian institution, and advances the religion Feminism in violation of the Establishment Clause.

77.  It does not matter that the funding authorized by the State Legislature and Congress flows through and is administered by executive agencies because the funds come from programs of specific disbursement by the State Legislature and Congress using their taxing and spending powers.

78.  That Columbia may serve as a conduit for State and federal aid to IRWG does not exempt such aid from Establishment Clause restrictions.

***Non-economic Standing***

79.  The inculcation, manifestation, and exposure of Feminism at Columbia is offensive to the plaintiff class and makes its members very uncomfortable with the result of interfering with the plaintiff class's use and enjoyment of Columbia as members of the Columbia Community.

80.  The ubiquitous nature of Feminism at Columbia brings the class members into direct contact with the offensive religion; thereby, making it an uncomfortable part of their experience in using the facilities of Columbia or taking advantage of the benefits that Columbia provides as their alma mater, college, or employer.

81.  As one pre-discovery indication of the pervasiveness of Feminism at Columbia, the following searches on Columbia's website provided the following results:

> "Feminist" yields 6020 references;
> "Feminism" yields 1440 references;
> "Masculinity" yields 613 references;
> "Masculine" yields 586 references;
> "Women's issues" yields 1620 references; and
> "Men's issues" yields 454 references.

82.  The Class Representative, as do other members of the class and as is their right, uses Columbia for library resources, career networking, e-mail services, discussion groups, career support, access to Columbia publications, attending various events, discounts and special offers, electronic learning, and pod-casts to listen to the newest ideas on campus.

83.  The Class Representative, as do other members of the class, receives communications from Columbia that enter his home through the U.S. Post and Internet disseminating the offensive orthodoxy of Feminism.

84.  As an alumnus, the Class Representative may also take courses in Continuing Education's auditing program without meeting the qualifications required of the general public and prepare for further graduate work through its Post Baccalaureate Studies.

85.  Such courses and studies, however, due to the Regents and SED's spreading of Feminism throughout higher education, assure that the Class Representative will encounter and be confronted with unwelcome and offensive Feminist dogma from the Columbia administration, professors, counselors, materials, and school activities.

86.  The plaintiff class members are not simply bystanders from the general public using the courts to vindicate abstract value interests, or citizens uninvolved with Columbia complaining of the nonobservance by distant others of the Constitution.

87.  Neither are the alleged injuries in this case simply noncognizable, psychological consequences produced by a fleeting observation of personally disagreeable conduct.

88.  The class members repeatedly come into direct contact with Feminism and the unwelcome observation of the manifestations of Feminism that would require them to alter their behavior in order to avoid such.

89.  The prevalence of Feminism at Columbia makes the class members feel as nonadherents, outsiders, and not full members of the Columbia Community.

90.  The plaintiff class members are also made to feel that they are unwilling participants in a faith not their own when they enter a space dedicated to two separate functions, education and inculcating Feminism.

91.  For both taxpayer and noneconomic standing, the plaintiff class alleges injuries that are both "fairly traceable" to the allegedly unlawful conduct of the defendants and "likely to be

16

redressed by the requested relief," since the relief sought is the cessation of the specifically

identified and alleged unconstitutional conduct.

### VI.  The Regents, SED, HESC, and USDOE Aid the Religion Feminism

***The Regents and SED's higher education policies on their face promote and favor the religion Feminism while inhibiting other contradictory viewpoints.***

92.  Since at least 1984, the Regents and SED have abandoned neutrality and acted with the

intent of endorsing, utilizing, and promoting a particular point of view in higher education—that

of Feminism.

93.  The Regents and SED in 1984 started to remake higher education in accordance with

Feminist doctrine that calls for the preferential treatment of females in areas where females were

already leading males.  The Regents required the adoption of Feminist beliefs and policies for

higher education through their Statewide Plans and Policy Statements.

94.  Previously in 1972, the Regents required that higher education take the lead in advancing

affirmative action for females in admission to colleges and degrees earned.  *Equal Opportunity*

*for Women-A Statement of Policy and Proposed Action,* Position Paper No. 14, pp. 6-8 (1972).

95.  The Regents' purpose in 1972 was to balance the number of males and females gaining

the benefits of higher education, *see Regents Statewide Plan* 1972, p. 103-04, since females only

made up 44% of all New York college students, *Regents Statewide Plan* 1972, p. 103, so in 1972

the Regents' policy had a secular purpose.

96.  In 1984, however, when there were already more females attending and graduating from

New York colleges and universities than males, the Regents' Statewide Plan still had as a top

priority increasing the number of females who attended and completed college programs.

*Regents Statewide Plan 1984.*

17

97.  The *Regents Major Policy Statement for 1984* also required enhancing the college opportunities for females to not only attend college but to give them added assistance at ensuring their successful completion even though they were already graduating in higher numbers than males.

98.  In 1988, the Regents Statewide Plan continued the Feminist policy of preferential treatment for females by calling for the increased participation of females in underrepresented fields even though it would further decrease the number of males receiving college degrees. *Regents Statewide Plan for 1988*.

99.  In 1993, when over 55% of New York State's college students were female, SED *ORIS,* and females earned 60% of the associate degrees, 54% of the bachelor degrees, and 58% of the master's degrees, *New York Annual Educational Summary 1990-91,* Table 42, p. 50, the Regents made their major policy statement that further instilled Feminism into higher education, which is still in effect today:  *Equity for Women in the 1990s, Regents Policy and Action Plan, Background Paper* (1993).

100.  *Equity for Women* requires establishing specific goals, indicators of progress, and a timetable for action to provide females with additional benefits and more preferential treatment in State colleges and universities that amount to a "super affirmative action" consistent with Feminist doctrine.

101.  *Equity for Women* creates a "comprehensive plan" and a "plan of action" for which "the entire educational community is accountable."  *Equity for Women-Action Plan* pp. 1, 6.

102.  The *Equity for Women-Action Plan* made Feminism the criterion for governing educational content, operations, monitoring, and decision making by the Regents, SED, HESC, and institutions of higher learning.

18

103.  The Regents and SED lead and support the continuing execution of the plan, *Equity for Women-Action Plan* p. 6, which requires "the cooperation of members of faculties, boards of trustees …, administrations of … colleges …, as well as … employers, and community members." *Id.* p. 6.

104.  *Equity for Women* guides the SED's actions with educators, educational institutions, and cultural institutions across the State, *Equity for Women-Action Plan* p. *v.*, and requires SED to give significant weight to the advice provided by the Commissioner's Statewide Advisory Council on Equal Opportunity for Women and Girls, *id.* p. 6.  (There is no Council on Equal Opportunity for Men and Boys, which is consistent with Feminist precepts.)

105.  The Regents' *Equity for Women-Action Plan* requires the following conformity with Feminist doctrine:

a.  Super affirmative action to increase the number of degrees received by females in those areas where they already receive well over 52%. *Equity for Women-Action Plan* p. 3.

b.  "[C]hang[ing] the way [educators] think and act [including speech] in order to achieve" super affirmative action goals for females.  *See id.* p. 5.

c.  "Major changes in curriculum and teaching" to accord with "[c]urrent studies about learning patterns and the intellectual development of women" that ends up promoting female friendly strategies over those helpful to males.  *Id.* p. 2.

d.  The SED staff to re-train faculty in the Feminist view of appropriate sex roles and provide "regular monitoring and reinforcement [of that view] in educational settings."  *Id.* p. 6.

e.  The SED staff to conduct "academic program reviews at colleges and universities" in order to determine whether gender specific patterns (traditional sex roles that resulted from six million years of evolution) have disappeared.  *Id.* p. 7.

f.  "Appropriate non-traditional role models" to increase the number of females enrolled in subjects such as mathematics, science, engineering, and computer technology with the quota numbers reported to Higher Education Data Systems, *id.* p. 7, which will further decrease the overall number of males graduating college.

g. "Practices that support, recruit, and promote women will be identified and replicated" while all others will be "eliminated," as determined by SED's Affirmative Action Officer *Id. p.* 9.

h. Focusing the support networks of colleges and creating others to promote the hiring and placement of females, *id.* p. 9, even though more females than males are hired on graduating college.

i. Developing, supporting, and promoting research on current issues facing females, but not males, that will be incorporated into teacher training by SED.

106.  The Regents' *Equity for Women-Action Plan* assigned SED the "responsibility to monitor progress toward the [above] stated goals," *id.* p. 11, which causes an excessive entanglement with the religion Feminism.

107.  In 2004, the Regents' Statewide Plan recognized that a super majority of all college students were female, that females earned 63% of the Master's degrees and a majority of the Doctoral degrees in the State, yet consistent with Feminist doctrine, the Regents showed no concern for rebalancing the numbers to achieve equity for men.  *2004 Statewide Plan* pp. 70, 72 chart 17.

108.  As a result of the Regents' enforcing Feminist precepts, today, females make up 58% of all New York's college students, females receive over 55% of the Bachelor degrees, over 63% of the Master's degrees, and over a majority of the Doctoral degrees.  SED*, ORIS.*

109.  By 2016, females will receive 64% of the Associate's degrees, over 60% of the Bachelor's degrees, 53% of the Professional degrees, and 66% of the Doctoral degrees.  National Center for Educational Statistics, *Digest of Educational Statistics*, Table 258.

110.  The Regents and SED, however, continue to enforce the same Feminist policies from 26 years ago of ginning up the number of female graduates even though males are now the overwhelming minority in higher education in the State.

111.  So why is this happening?  Because the secular purpose that initially drove equal opportunity between the sexes in 1972 has turned into Feminist dogma—a religion that preaches females are the chosen ones deserving of preferential treatment with the result that the educational system will continue to focus on providing females benefits while ignoring males.

112.  There's no other way to explain it.  It's no longer equality, since the results have gone far beyond equal treatment by the Regents and SED's own measures.

113.  Since at least 1984, the Regents and SED have adopted Feminist beliefs as true in determining their educational policies for higher education, and then employed Feminist action plans based on those beliefs to create a higher educational system that operates consistent with and acceptable to Feminist doctrine while other contrary viewpoints are eliminated.

114.  The Regents and SED have demonstrated a preference for the particular creed Feminism and created an impermissible entwinement of religious and civic authority that advances Feminism through SED's comprehensive, discriminating, and continuing surveillance to ensure Columbia and IRWG administrators and teachers think, speak, and act appropriately.

115.  The power and authority of the Regents and SED have been placed on the side of one particular set of believers—Feminists, which in effect forces others to conform to the establishment of Feminism or keep silent.

116.  Such risks the inevitable result of government incurring the hatred, disrespect, and even contempt of those who hold contrary beliefs.

117.  USDOE, by delegating its college accrediting responsibilities to the Regents, knowingly facilitates and aids the Regents and SED's purpose and divisiveness in advancing Feminism.

***The Regents, SED, HESC, and USDOE's financing of higher education has an as applied aiding of the religion Feminism at Columbia's IRWG.***

118.  IRWG is considered an educational institution under 20 U.S.C. § 1681(c)(Title IX).

119.  The Regents, SED, HESC, and USDOE are responsible for and knowingly provide financing to Columbia and students pursuing Women's Studies at IRWG that benefit IRWG—an institution by its own admission where a substantial portion of its functions are subsumed in the Feminist mission.

120.  IRWG's website, under "History of the Institute," states the "Institute faculty provide feminist instruction … leading to an undergraduate major, concentrations of several varieties, and a graduate certification program" in Feminism while providing a lecture series titled "Feminist Intervention."  IRWG website, http://www.columbia.edu/cu/irwag/index.html.

121.  IRWG's website, under "Programs of Study," states the Institute provides a "theoretically diverse understanding" of feminism through "courses in feminist theory, inquiry, and method…."  *Id*.

122.  The "Undergraduate and Graduate Programs" at IRWG center on courses in "feminist texts, theory, inquiry, perspectives, thought, and scholarship."  *Id*.

123.  IRWG's website, under "Calendar of Events," lists events centered on Feminism.  *Id*.

124.  According to the IRWG course guide, the Institute's "[p]rimary courses focus on women, gender, and/or feminist or [lesbian] perspectives."  *Id*.

125.  All of IRWG's functions serve the Feminist mission by advocating, instructing, promoting, inculcating, supporting, and providing training in Feminist doctrine.

126.  IRWG imposes on its employees and students a unitary belief system of Feminist orthodoxy that dictates thought, speech, and conduct.

127.  Consistent with Feminist precepts, IRWG advocates that the civil rights of today's males be minimized or eliminated not just as punishment for the alleged past wrongs of their forefathers but to assure the preferential treatment of modern-day females in determining the occupants of the prestigious and influential positions in current American society and into the indefinite future.

128.  IRWG's Women's Studies program instructs, trains, supports, furthers, cultivates, and advocates strategies and tactics for demeaning and abridging the rights of men in accordance with Feminist doctrine.

129.  IRWG propagates false Feminist myths about males.

130.  IRWG, in accordance with Feminism, stereotypes males as the primary cause for most, if not all, the world's ills throughout history.  Females, on the other hand are credited with inherent goodness for as Dr. Warren Farrell said, "Feminists call it sexism to refer to God as He; they don't call it sexism to refer to the Devil as He."

131.  IRWG instills the Feminist beliefs that males are oppressors and females the victims, and males reap the rewards of society while females shoulder the burdens.

132.  IRWG propagates the Feminist belief that males are responsible for most of the battering between the sexes when females batter males to the same extent or more.  Martin Fiebert, *Annotated Bibliography Assaults by* Women, Department of Psychology, California State University, www.csulb.edu/~mfiebert/assault.htm.

133.  IRWG follows the Feminist line that hides inconvenient facts, such as among the elderly, caretaker wives are most likely to abuse their older, sicker husbands, and females worldwide commit more dating violence than their male counterparts.

23

134.  IRWG propagates the Feminist illusion that only females sacrifice for others when it is more likely for a man to sacrifice for someone else.  For instance, all the firefighters and police who died on 9/11 were men, and only 20% of the male passengers survived the Titanic while 74% of the females lived.

135.  IRWG advocates the Feminist precept that females should receive preferential treatment at the expense of the violation of men's rights because men are the disposal sex.

136.  IRWG, as does Feminism, justifies paternity and maturity fraud as well as parental alienation when it is engaged in by a female.

137.  IRWG propagandizes the Feminist notion that when men are disadvantaged it is solely their fault, such as dying sooner than females, doing worse in almost everything in school, being less likely to attend college, paying for children their ex-wives have turned against them, being sentenced to more time for the same crime, having to register for the draft, or comprising more of the homeless.

138.  IRWG, as does Feminism, advocates the punishment of men for speaking as they will and acting as they chose even when such actions do not violate any laws.

139.  IRWG cultivates the preconceived Feminist judgment that children raised by single mothers do better in comparison to children raised by single fathers.

140.  IRWG provides information consistent with Feminist doctrine on how females can engage in violence against males, even premeditated murder, and escape just punishment by falsely accusing the male of abuse.

141.  IRWG offers only a Feminist curriculum that is deficient of texts and instruction providing a countervailing masculine view.

142.  IRWG, consistent with Feminist doctrine, exalts females over males in most endeavors except for example dying to defend this country.

143.  By its own admission, IRWG is the "locus" of Feminist instruction at Columbia.

144.  IRWG has a catalogue of Feminist activities that permeate it and whatever secular teaching at IRWG may exist cannot be separate from its Feminist mission.

145.  Since SED has approved and periodically re-approves IRWG's operations and offering of Women's Studies degrees, 8 N.Y.C.R.R. §§ 52.1 & 52.2, Columbia receives "Bundy Aid" under N.Y. Educ. Law § 6401 for each IRWG Women's Studies degree conferred and Columbia receives directly State and federal financial aid for IRWG students.

146.  Both Bundy and governmental student financial aid benefit IRWG.

147.  The funding that benefits IRWG originates from State and federal taxes that the New York Legislature and Congress appropriate for higher education and respectively mandate the Regents, SED, HESC, and USDOE to expend.  *See above* ¶¶ 74, 75.

148.  On information and belief, IRWG also receives from USDOE financial awards, contracts, and research grants appropriated and mandated by Congress for higher education.

149.  Whenever government funding flows to an institution in which a substantial portion of its functions are subsumed in a religious mission, here Feminism at IRWG, the aid is considered to have a principal or primary effect of advancing religion even though the Legislature and Congress designated the funds for secular purposes.

150.  IRWG administrators and teachers indoctrinate Feminism by supporting and instructing persons in a body of Feminist doctrine or principles, initiating persons by means of Feminist doctrinal instruction, imbuing persons with a Feminist partisan or ideological point of view, and inculcating Feminism.

151.  On information and belief, State and federal funds paid directly to Columbia—Bundy Aid that benefits IRWG, student aid that benefits IRWG, or awards, contracts, and grants designated for IRWG—help indoctrinate Feminism by financing the materials used at IRWG and the salaries of IRWG employees who administer and daily preside over Feminist courses, meetings, lectures, seminars, consciousness raising sessions, publications, counseling, and career advising for which the goals are to convince persons to turn their will and their lives over to the care of Feminism.

152.  Such governmentally funded activities result in the impermissible governmental indoctrination of religion.

153.  By the end of fiscal year 2009, federal advances to Columbia University, which are listed as liabilities on Columbia's balance sheet, totaled $ 76.7 million, a portion of which on information and belief benefited IRWG.

154.  By the end of fiscal year 2009, USDOE had made available to Columbia $234.7 million from the Stafford Loan and Federal Plus Loan programs (separately listed in Columbia's financial notes) of which a portion benefited IRWG.

155.  For fiscal 2009, federal tuition aid grants, federal supplemental educational opportunity grants, and Pell grants were provided Columbia in the area of $9 million, a portion of which benefited IRWG.

156.  Total federal awards to Columbia University in fiscal 2009 were $686,700,000. "Awards include all federal assistance entered into directly between the University and the federal government" and "pass-throughs, which are not student loans."  Columbia University, *Notes to Summary Schedule of Expenditures of Federal Awards Year Ended June 30, 2009*.

157.  Of the total federal awards to Columbia as of June 2008, the latest available, $17.6 million originated with USDOE, which on information and belief benefited IRWG.

158.  Columbia's total operating budget for fiscal 2008 was $3 billion and for 2009 was $3.2 billion.

159.  From 1996 to 2009, SED has paid to Columbia well over $40 million in Bundy Aid, a portion of which benefited IRWG.

160.  For academic years 2005 through 2007, HESC provided Columbia University with over $5 million for grants, scholarships, and other awards, a portion of which benefited IRWG.

161.  On information and belief, Columbia University invests significant amounts in IRWG from the above sources, ¶¶ 153-60, which its managerial accounting practices will reveal through discovery.

162.  The Regents, SED, and HESC's educational policies and funding and USDOE's funding directly enable and endorse the inculcating of Feminism at Columbia and IRWG.

163.  An objective-reasonably person would perceive the Feminism manifested at Columbia and IRWG to be governmentally sponsored and supported religious activity.

## VII.  Relief Sought

164.  Declare unconstitutional for violating the Establishment Clause and enjoin the State defendants' policies and plans that require the institutionalization of Feminism at Columbia and IRWG.

165.  Declare that the use of New York State and federal funds to aid Feminism at IRWG violates the Establishment Clause.

166.  Enjoin the State and Federal defendants from expending governmental funds that benefit Feminism at IRWG.

167. Such other relief as this Court deems just and proper.

168. The plaintiff class requests a jury trial.

Dated: December 10, 2010
      New York, N.Y.

                                 /S/
                             _____
                             Roy Den Hollander, Esq. (1957)
                             Class attorney and representative
                             545 East 14 Street, 10D
                             New York, N.Y. 10009
                             (917) 687-0652